**In re McCOMBS PROPERTIES VIII, LTD., a California limited partnership, Debtor.**

**Bankruptcy No. SA 87–01381 JR.**

United States Bankruptcy Court, C.D. California.

Aug. 11, 1988.

Jeffrey W. Broker of Lobel, Winthrop & Broker, Irvine, Cal., for debtor.

John T. Ruff, Neely & Player, Atlanta, Ga., for Southern Woods.

R. Hillary Willett of Buchalter, Nemer, Fields & Younger, Newport Beach, Cal., for Great American.

Susan W. Kramer, Parker, Johnson, Cook & Dunlevie, Atlanta, Ga., for Southern Federal.

Bennett L. Spiegel, Levene and Eisenberg, Los Angeles, Cal., for Woodland Center.

Mark Kompa, Hart, King and Coldren, Santa Ana, Cal., for Brown Investments.

Keith Meyer, official limited partners' committee, Garber, Marshack, Fell & Meyer, Sant Ana, Cal.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

A preliminary issue requiring resolution at the hearing on confirmation involved the determination of the market rate of interest that debtor is required to pay on the "forced" loans in debtor's plan of arrangement in order to satisfy the requirements of § 1129(b)(2)(A)(i)(II) of the Bankruptcy Code. After hearing the evidence, I took the matter under submission advising debtor that the interest rates required to provide a present value equal to the allowed secured claim of each of the objecting secured creditors would be in excess of the 10.5% accrual interest rate provided in debtor's plan of arrangement (the "Plan") and that I would issue this memorandum opinion no earlier than 14 days after the hearing to give debtor some additional time to negotiate the issue with these creditors.

## JURISDICTION

This court has jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

## STATEMENT OF FACTS

Debtor is a California limited partnership formed on May 16, 1983 for the purpose of owning and operating a diversified portfolio of income producing real properties. The limited partners invested an aggregate of $24,285,500 in debtor. The funds were used to purchase the following seven projects: (1) Southern Woods Apartments; consisting of 140 units located in Tucker, Georgia. (2) Palmer House Apartments; consisting of 144 units located in Greensboro, North Carolina. (3) Packers Square Shopping Center; consisting of five buildings located in Tustin, California. (4) Woodland Village Retail/Office Center; located in Woodland Hills, California. (5) Cedar Woods Business Park; consisting of five buildings located in Fullerton, California. (6) River Ridges Apartments; located in Arlington, Texas and eventually lost to foreclosure. (7) Barcelona Apartments; located in Tulsa, Oklahoma. This property was later sold.

At the confirmation hearing, five creditors objected to their treatment under the Plan. As to all creditors, debtor proposes to cram down under § 1129(b)(2)(A)(i)(II) of the Code and force these creditors to accept an accrual market rate of interest at

10.5% with a base rate for current payments of 9%. In other words, to the extent income from the property cannot pay 10.5%, debtor proposes to pay at least 9% and accrue the difference until sufficient funds are available for pay out. Debtor also proposes to extend some of the loans to ten years. The objecting creditors claim the proposed interest rates and accrual feature of the Plan do not provide "fair and equitable" treatment to them under the Plan.

Gate City Savings and Loan ("Gate") has a first priority security interest in Palmer House and is presently owed approximately $1.2 million. Palmer House has an estimated value of approximately $4.3 million. Gate's loan to value and debt coverage ratios are 28% and 280%, respectively,

Brown Investment ("Brown") has a second trust deed on Palmer House and is owed approximately $2.4 million. Brown's loan to value and debt coverage rations are 84% and 93%, respectively.

Brown offered the declaration of Mr. William F. Morgan, Vice President of the commercial lending division of First Union National Bank to support its objection. In his opinion, the minimum interest rate to support a comparable loan would be 12% (i.e. prime (9%) plus 3%). In giving his opinion he took into consideration the second lien position of Brown, an equity cushion of approximately $295,000 and a loan coverage ratio exceeding 80%.

With respect to the Woodland Center property, it has an appraised value of $6.5 million. Woodland Center, Ltd. ("Woodland") has a second trust deed on the Woodland Center property with an aggregate outstanding indebtedness of $4.4 million. The loan to value and debt coverage ratios are 91% and 88%, respectively.

To support its objection to the 10.5% rate, Woodland offered the declaration of Dr. Michael Tennenbaum, a principal in the valuation and financial consulting firm of Flavell, Tennenbaum & Associates. He made a market study to ascertain the range of appropriate market interest rates required to reduce future cash flows to present value. He concluded that the appropriate rate would substantially exceed 10.5%.

In conducting his survey, he contacted mortgage brokers, mortgage bankers and other lenders in Southern California to determine the appropriate interest rate. He determined that it would be very difficult to obtain a second trust deed loan on the Woodland property with the high loan to value ratio (91%), a debt coverage ratio less than 100%, and interest only payments for 10 years. Tennenbaum further learned that second trust deed obligations on highly leveraged comparable properties would be priced at rates of return between 11% and 12%, assuming amortization of principal over the term of the loan. In his view, an additional interest premium of at least 1% to 2% would be required for an interest only loan. Accordingly, he opined that the appropriate discount rate should be between 12% and 14%.

At an earlier hearing, I found the value of the Southern Woods property to be $3.6 million. Southern Federal Savings and Loan of Georgia ("Southern Federal") holds a first trust deed securing an outstanding indebtedness of approximately $2.4 million. Southern Woods Associates, Ltd. ("SWA") holds a second trust deed securing a present indebtedness of approximately $1.2 million. The loan to value and debt coverage ratios for Southern Federal are 66% and 107%, respectively. The same ratios for SWA are 100% and 72%, respectively.

Southern Federal presented the testimony of Mr. William G. Iacobucci, Regional Manager/Multi-family Servicing Fund for the Southern East Region for the Federal Home Loan Mortgage Corporation. He indicated that the present FNMA rate for an amortizing fixed-rate loan is 11.29%. Since the proposed loan is interest only and has a negative amortizing schedule, he would add a premium of .75% to this rate. He, therefore, would estimate the fair market rate for such a loan to be 12.04%.

In response to these objections, debtor filed the declaration of Mr. David Gribin, President of Gribin Financial Corporation, a firm specializing in asset and property

management. Gribin has been active in the real estate management field for over 15 years. He was retained by debtor to determine whether the stream of deferred cash payments payable to the secured creditors under the Plan has a present value, as of the effective date of the Plan, equal to at least the value of the creditors' interests in the property of the estate. The loans proposed by debtor are fully secured, interest only, real estate loans, with 10 year maturities. Monthly payments are calculated at a 9% per annum rate, but may be as high as 10.5% per annum subject to available funds. Moreover, to the extent a claimant receives payments less than an amount calculated at the 10.5% per annum rate, the difference will accumulate and be added to principal of the claims at the end of each year and will thereafter accrue interest at the 10.5% rate.

According to Gribin, the 9% minimum pay rate and the 10.5% accrual rate offered in the Plan are competitive with current rates offered on similar loans in the market place. To reach this conclusion, he reviewed rates charged by savings and loan institutions in California. He concluded that loans secured by commercial real properties are made at interest rates equal to 2.5 points over the Eleventh District of the Federal Loan Home Mortgage Board of San Francisco (the "Eleventh District Index"). The Eleventh District Index for the month of May 1988 was approximately 7.5%. According to him then, the appropriate savings and loan *variable* rate on commercial properties would be approximately 10%. It was pointed out, however, that the Plan calls for a *fixed* accrual rate of 10.5%.

Gribin also testified that the FNMA fixed-rate loans on commercial properties ranged between 10.38% to 10.66%. The term of these loans is generally ten years. He further indicated that commercial lenders (i.e. insurance companies, pension plans) would make variable rate amortizing loans at between 10% and 10.5%. Lastly, he testified that rates on second trust deed loans ranged between 7% and 11%.

## DISCUSSION

Any confusion regarding the appropriate approach in determining the discount rate for § 1129(b)(2)(A)(i)(II) of the Code was dispelled with the decision in *In re Camino Real Landscape Maintenance Contractors,* 818 F.2d 1503 (9th Cir.1987). In *Camino Real,* the court adopted the approach set forth in Colliers on Bankruptcy, Vol. 5, ¶ 1129.03 [4][f][i], at 1129 through 65 (15th Ed.1987). That test is stated as follows:

> The appropriate discount rate must be determined on the basis of the rate of interest which is reasonable in light of the risks involved. Thus, in determining the discount rate, the court must consider the prevailing market rate for a loan of a term equal to the payout period, with due consideration of the quality of the security and the risk of subsequent default.

*Id.* at 1505. The Eighth and Eleventh Circuits also adopted this test. See *United States v. Neal Pharmacal Co.,* 789 F.2d 1283, 1285 (8th Cir.1986); *In re Southern States Motor Inns, Inc.,* 709 F.2d 647, 651 (11th Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). The Ninth Circuit Bankruptcy Appellate Panel also used this test in *In re Welco Industries, Inc.,* 60 B.R. 880, 882 (9th Cir. BAP 1986).

The key to this test is that one does not look at the characteristics of the creditors in determining the interest rates. Rather, the debtor's capacity to borrow a similar amount on like terms in the market place is the appropriate focus of inquiry. *Camino Real, supra* at 1506. Although the issue in *Camino Real* involved a calculation of the § 1129(a)(9)(C) rate, the present value analysis is the same and the court's reasoning and holding are likewise applicable here. *Id.* at 1505.

In *Welco, supra,* the Bankruptcy Appellate Panel (the "BAP") also rejected the use of 26 U.S.C. § 6621 to establish the present value interest rate for deferred payments under § 1129(a)(9)(C) stating "The appropriate interest rate is the prevailing market rate for that type and quality loan. Current market conditions deter-

mine what the market rate will be." 60 B.R. at 883. See also *In re James R. Orosco,* 77 B.R. 246 (Bankr.N.D.Cal.1987).

In a more recent BAP case, *In re Patterson,* 86 B.R. 226 (9th Cir. BAP 1988), the court upheld the bankruptcy court's determination that prime plus 4% for loans extending beyond five years was an appropriate discount rate under § 1225(a)(5)(B)(ii) of the Code. The court acknowledged that a blanket approach to those determinations is inappropriate stating "A case-by-case determination of the interest rate is mandatory because it is calculated according to the rate the reorganizing debtor would have to pay a creditor in order to obtain a loan on equivalent terms in the open market." *Id.* at 227.

■ Before going any further with this issue of the appropriate present value discount rates for these forced loans under the Plan, I need to resolve the creditors' objections to the use of an accrual rate. As previously explained, debtor proposes to pay currently at the rate of 9% and accrue an additional 1.5% unless net cash flow allows for payment of this accrual. If at the end of the year an accrual exists, it will be added to principal.

The objecting creditors argue that this treatment does not satisfy the fair and equitable test of § 1129(b)(2)(A)(i). Under this test, the secured creditors must receive payments equal to their allowed secured claims and these payments must have a present value equal to their allowed secured claims. The controversy relates to the present value issue and whether a *deferral on deferral* is appropriate.

Debtor points to two cases to support its accrual provision. See *In re Pinebrook, Ltd.,* 85 B.R. 160 (Bankr.M.D.Fla.1988); *In re James R. Orosco, supra.* In *Pinebrook,* the plan provided for the accrual of the *contract* rate (12%) and regular payment at 9%. Testimony revealed that market rates for comparable loans ranged between 8⅝% and 9¾%.

The court found that the dissenting creditor would receive the full present value of its claim under the plan. *Id.* at 162. This makes sense because current payments

would be made at the market rate and the plan provided an upside for the creditor by accruing the difference between the contract rate and the market rate. Obviously, debtor is not doing that here. The payment rate on all these forced loans is substantially below the market rate.

In *Orosco,* the court found that a variable interest rate that would be adjusted each year based on any *increase* or *decrease* over the Eleventh District Rate was acceptable provided some additional creditor protections were incorporated into the plan. I do not read *Orosco* as supporting debtor's contention. The variable interest rate formula approved in *Orosco* is distinctly different than debtor's proposal and is not based on an accrual concept.

I do not believe Congress had in mind the deferral of any portion of the current interest payments required to make a secured creditor whole under the fair and equitable test. If I accepted debtor's argument, I would undercut the principle of present value which has been so carefully woven throughout the Code. You cannot defer the very interest payments that create present value and have present value of a stream of deferred principal payments.

Debtor might contend (although it did not) that the interest rate can be adjusted to reflect this accrual concept. Even if I agreed, I would be just guessing at the proper adjustment. I am unaware of any lenders that make loans on this basis. Furthermore, I am certain this was not the intent of Congress when it incorporated the present value concept into the Code.

Accordingly, I reject the idea of an accrual of present value payments and require monthly payments to be made currently at the appropriate market rate of interest which I shall now determine for each forced loan.

■ Debtor contends that I should use the interest rates for seller financed loans on comparable properties. According to debtor's expert, the range of rates for these types of loans is 7% to 11%. Debtor points out that generally when a seller takes back a loan, the purchase price is

increased to reflect the seller's risk in financing the transaction. Because the creditor in this situation has already been rewarded, debtor contends a lower rate is appropriate. The creditors who are in this category are Brown, Woodland, and SWA.

As I told debtor at the hearing, I do not believe the issue of seller financing during the initial transaction is relevent to a determination of the appropriate interest rate for the forced loans in the Plan. The Plan has the effect of proposing new loans by changing the terms of the existing loans. Unquestionably, a condition to accomplishing debtor's objective is an interest rate based on what debtor would have to pay to borrow *today* given a similar amount, terms and risks. As stated in *Camino Real*, "The debtor's characteristics determine the interest rate. The creditor's characteristics are irrelevant." *Id.* at 1506. Accordingly, the past is irrelevant to the present value analysis and the determination of a market rate of interest for the forced loans.

Addressing the Gate loan first, Gate is oversecured as the first lien holder on the Palmer House property. It presently enjoys a low loan to value ratio of 28%. Additionally, the coverage ratio is 280%. According to debtor's expert, the average FNMA interest rate on fixed-rate loans on multi-family properties of this kind is 10.5%. It appears commercial lenders would make variable-rate loans on comparable properties at between 10% and 10.5%. However, these are amortizing loans. I think a .25% premium is appropriate to reflect the added risk of a nonamortizing loan. Accordingly, I find the appropriate interest rate on the Gate loan should be 10.75%.

With respect to the Brown loan on the Palmer House property, Brown is in second position. It has an estimated loan to value ratio of 84% and a coverage ratio of 93%. Obviously, this is a risky loan for a lender. The loan to value ratio is acceptable for a second place financing, but a lender is unlikely to loan when projected income covers only 93% of the annual interest payments.

Debtor correctly points out that the Plan provides for a reserve to correct this deficiency during the early years of the loan. A lender will likely give some value to this even though there is no guarantee that the funds will be available if needed elsewhere. I believe a willing lender would add a 1.5% premium because the loan lacks debt coverage, is second in priority, is nonamortizing, and has a fixed interest rate. Accordingly, I believe the fair market interest rate on the Brown loan is 12%.

Turning next to the Woodland Center property, Woodland has a second trust deed securing approximately $4.4 million with a loan to value ratio of 88% and a loan coverage ratio of 91%. Tennenbaum, Woodland's appraiser, says most lenders would not make this loan given the high loan to value and income coverage ratios. If a lender did, he estimates an interest rate range of 12% to 14%. He would then add a premium of at least 1% to 2% to reflect the absence of a market for this kind of loan. I am unwilling to make an adjustment because lenders normally would not make the loan. A basic assumption in performing this present value analysis is that there is a hypothetical lender who will make a loan at a rate that reflects current market conditions and the associated risks. With this in mind, I find the appropriate interest rate for the Woodland Center loan is 12.125%.

As for the Southern Woods property, the first lien holder is Southern Federal. Its loan to value and income coverage ratios is estimated at 66% and 107%, respectively. These ratios are not out of line. Southern Federal offered the testimony of Mr. Iacobucci. He indicated that the appropriate rate should be 12.04%. I think he is overly aggressive in determining the rate. I believe the analysis that applied to the Gate loan is equally appropriate here. I, therefore, find 10.75% to be an appropriate rate.

Lastly, the SWA loan reflects loan to value and income coverage ratios of 100% and 72%, respectively. The Woodland loan analysis is applicable here although an additional adjustment is appropriate since

there is no equity. Accordingly, I find the appropriate interest rate to be 12.25%.

Separate findings of fact and conclusions of law with respect to this ruling are unecessary. The within memorandum opinion shall constitute my findings of fact and conclusions of law.

## ORDER

In accordance with the findings of fact and conclusions of law set forth in my memorandum opinion this date, it is

ORDERED that the fair and equitable test of § 1129(b)(2)(A)(i) of the Bankruptcy Code requires that debtor's proposed plan of arrangement be modified to delete the deferral provision on the interest payments payable on the forced loans and change the interest rates on the forced loans to reflect a present value interest rate as set forth in the memorandum opinion.