In re MEMPHIS PARTNERS, L.P.
d/b/a Faronia Square Apartments.

No. 388-02771.

United States Bankruptcy Court,
M.D. Tennessee.

May 2, 1989.

William L. Norton, III, Boult, Cummings, Conners & Berry, Nashville, Tenn., for debtor.

David Blaylock, Udelsohn, Blaylock, & Marlow P.C., Memphis, Tenn., for Richard L. Akers, John T. McCallen, James F. McCallen, Jr. and Gene L. Whitington.

MEMORANDUM OPINION

GEORGE C. PAINE, II, Chief Judge.

The case is before the court on a confirmation hearing of debtor Memphis Partners' plan for reorganization. The former owners, Richard L. Akers, John T. McCallen, James F. McCallen, Jr., and Gene L. Whitington (the McCallen Group) object to confirmation. The McCallen Group holds a first mortgage on the debtor's principal asset, the Faronia Square Apartments, to secure a wraparound promissory note. The McCallen Group objects to confirmation of the plan because it asserts it will not get the present value of its claim under the plan.

The following constitutes the finding of fact and conclusions of law in this proceeding under Bankruptcy Rule 7052. This is a core proceeding.

In the fall of 1984, the McCallen Group sold the Faronia Square Apartments to the predecessor of the debtor, Faronia Square Ltd. The sale price was $5,500,000. As part of the sale the McCallen Group took a promissory note in the amount of $5,100,-000 secured by a mortgage on the Faronia Square Apartments. The interest rate on the promissory note was 10 percent. On December 31, 1985, Faronia Square Ltd. sold the Faronia Square Apartments to the debtor. In the transaction the debtor assumed the McCallen Group's note. Both Faronia Square Ltd. and the debtor, Memphis Partners, are limited partnerships es-

tablished by Freeman Webb Investments, Inc. Freeman Webb Investments, Inc. and William H. Freeman are the general partners of the debtor. At the time of the filing of the petition, the debtors owed McCallen Group $4 million on its promissory note. The property was also subject to a second mortgage in favor of Metropolitan Life Insurance Company. Metropolitan Life's claim on the property at the time of the filing was $800,000. The interest rate on the Metropolitan Life note is 12 percent.

Both the McCallen Group and the debtor submitted expert appraisals of the Apartments. Debtor's appraiser estimated the property to be worth $3,900,000. The McCallen Group's appraiser estimated the value to be $4,200,000. Based on the testimony of two experts and their submissions the court finds the debtor's appraiser's estimate to be more credible and finds the property to be worth $3,900,000.[1] The evidence further indicates that the value is not expected to change appreciably in the foreseeable future.

Under the plan, the McCallen $4,000,000 claim would be paid over ten years through a negative amortization plan designed to pay the McCallen Group the equivalent of a note amortized over 30 years at a rate of 9 percent interest with a balloon payment due in ten years. In the first four years, the debtor would pay 8 percent on the note; in years five and six, the debtor would pay 9.3 percent; in years seven and eight, the debtor would pay 10.83 percent; and in years nine and ten, the debtor would pay 11.7 percent on the note. The debtor would pay a flat 9 percent on the second mortgage for the first five years, and then 1 percent over prime for the remaining five years. In addition, the first mortgagees would receive a net cash flow from the operation of the apartment complex after the funding of a reserve for maintenance and upkeep in the amount of $50,000. As that reserve was used it would be replenished before the net operating cash flow would be paid to the McCallen Group.

The McCallen Group, the first mortgagee, has rejected the plan and is the only creditor in an impaired class. Thus, in order to confirm the plan, the plan must meet the requirements of § 1129(b). The McCallen Group asserts that the plan is not fair and equitable and does not meet § 1129(b)(2)(A) because they will not receive the present value of their claim. They assert that first, the 9 percent interest rate is too low and, second, the negative amortization denies them the present value of their claim.

## I. THE INTEREST RATE

■ The McCallen Group asserts that, under controlling authority in the Sixth Circuit, the debtor must pay the prevailing market rate for comparable loans made by institutional lenders in order to give the creditor the present value of its secured claim. *Memphis Bank and Trust Company v. Whitman*, 692 F.2d 427, 431 (6th Cir.1982). The court there held that the appropriate interest rate to give a creditor present value of a secured claim was "current market rates of interest used for similar loans in the region." *Id.* The evidence presented by both sides supports a finding that the institutional rate, that is the rate which institutional lenders would charge on such loans, is between an 11½ and 12½ percent. Thus the 9 percent rate fails to meet the requirements of § 1129(b).

The debtor argues that the correct set of similar loans to use to establish a market rate should be seller-financed sales of commercial properties. The testimony of the debtor's experts, however, demonstrate that the loan contemplated here is not similar to seller-financed transactions.

Debtor's experts, Rudy Thacker and Stephen F. Wood, both testified that sellers who finance sales will often accept interest rates lower than institutional lenders in exchange for increased, or inflated, sale prices. Such terms still give sellers a rate of return close to the rates charged by

---

**1.** Debtor had filed a motion to judicially estop the McCallen Group from denying an appraisal that they submitted in a prior state court action. That appraisal estimated the value of the property to be $3,016,000. The court did not address the objection in court and now does not need to since it found the debtor's appraisal to be correct.

institutional lenders. The ten percent rate on the 1984 loan was just such negotiated rate as it was two to three points below institutional rates. Mr. Thacker, who was involved in negotiating the 1984 sale, stated that this lower rate reflected the fact that the sale price, $5,500,000, was $1,000,000 over the then market value of the property.

In Chapter 11 proceedings debtor and creditor do not negotiate on either price and interest rates. The debtor is entitled to force the creditor to make a forced loan for 100 percent of the appraised value of the collateral. This is a new loan, not based on the prior contract. *Whitman,* 692 F.2d at 431. In exchange for this new loan, the creditor is entitled to an interest rate that ensures him the present value of the loan amount. Interest rates in seller-financed transactions where parties can negotiate on all of the terms, bear no relationship to the rigid forced loan on 100 percent of the appraised value contemplated by § 1129(b).

The quoted rates from institutional lenders arguably are not sufficient to give the creditor the present value. The forced nature of the loan may warrant an additional premium to insure present value. *Whitman,* however, indicates that this court should use readily available market rates to simplify the process of proof at confirmation. Thus, the correct rate of interest to give present value under *Whitman* is the rate charged by institutional lenders for similar commercial transactions. Here the evidence showed that rate to be between 11½ percent and 12½ percent.[2] The proposed nine percent rate fails to meet the requirements of § 1129(b).

It is true that under this plan the debtor intends to pay the full $4,000,000 debt back to the McCallen Group, not just $3,900,000, the appraised value. The additional payment of principle would increase the rate of return on the value of the collateral, but

there is no showing that this slight payment of additional principle will raise the effective rate of return to between 11½ and 12½ percent.

The debtor has cited a number of cases in which courts defined the market rate as the rate which a creditor would accept in a transaction with a similar set of risk factors. *In re S.E.T. Income Properties, III,* 83 B.R. 791, 793 (Bankr.N.D.Okl.1987); *United States v. Southern States Motor Inns,* 709 F.2d 647 (11th Cir.1983) (interest on delinquent taxes under § 1129(a)(9)(C)); *In re Konzak,* 78 B.R. 990, 992 (Bankr.D.N.D.1987) (Chapter 12 case); *In re Doud,* 74 B.R. 865 (S.D.Iowa 1987) (Chapter 12 case); *In re Trigwell,* 67 B.R. 808 (Bankr. C.D.Cal.1986) (Chapter 13 case).

From these references, the debtor argues that the court should look not at the market rate of interest, but at the rate which a particularized creditor would accept in a particular transaction. That is not what the Sixth Circuit meant in *Whitman.* Rather, the *Whitman* Court was speaking of what creditors in the market generally would accept under the circumstances. In most of the cases cited by the debtor the courts used quoted rates from institutional lenders. To the extent the cases disagree with the court's understanding of *Whitman,* this court declines to follow them.

The court finds that the proposed 9 percent interest rate is not sufficient to insure the creditor of present value of his claim under *Whitman.*

## II. NEGATIVE AMORTIZATION

 The McCallen Group also argues that the negative amortization plan denies them the present value of their secured claim. They assert they are at risk because they have to wait until far into the plan to receive the payments designed to give them the present value of their claim.

---

**2.** The ten percent rate charged in the initial contract has no bearing on this new forced loan. There is some language in *In re Colegrove,* 771 F.2d 119 (6th Cir.1985) about the contract rate being the maximum rate. That case, however, dealt with interest on payment of arrearages in

a Chapter 13 case in order to reinstate the existing contract. It says nothing about the rate to be charged in an entirely new, forced loan from an impaired creditor in a Chapter 11 plan. *See In re Kain,* 86 B.R. 506 (Bankr.W.D.Mich.1988).

**388**

If the plan should some how fail in the early years, they will have failed to receive the payments sufficient to protect their interest.

The debtor argues that a negative amortization plan meets the requirement of § 1129 because it mathematically provides the creditor with the present value of his secured claim.

The real question before the court is whether negative amortization plans such as this are fair and equitable. The court agrees that, with an appropriate interest rate, a negative amortization plan can mathematically provide present value. The problem is that in the early years of such financing the creditor is at risk of not receiving the present value should the plan end prematurely. *See In re Spanish Lake Associates,* 92 B.R. 875, 18 B.C.D. 693 (Bankr.E.D.Mo.1988).

As the court in *Spanish Lake* noted, the real question is whether, under the circumstances, is it fair and equitable to place this additional risk on the creditor. *But see In re McCombs Properties VIII, Ltd.,* 91 B.R. 907 (Bankr.C.D.Cal.1988) (deferred interest payments never sufficient to give creditors present value). The *Spanish Lake* court listed several factors to consider in evaluating whether the risk in the particular plan was fair and equitable. *Spanish Lake,* 92 B.R. 875, 18 B.C.D. at 695. These factors boil down to (1) how much of the interest is deferred, (2) for how long and (3) whether the collateral can provide additional security to the creditor should the plan fail.

In this case the principal owed the creditor increases for six years until it reaches $4,203,252. The principal does not drop below the original $4,000,000 until over 8½ years into the loan. At the end of the loan the principle due would be $3,874,000. Requiring the McCallen Group to wait and risk that the plan will work for over 8½ years to receive the payments that ensure them the present value of their claim is not fair and equitable. This is especially true since the property contains no equity cushion to reduce those risks. Even at the end of the term the amount owed barely drops below the value of the property.

## CONCLUSION

The court finds that debtor's plan cannot be confirmed because an impaired creditor that is the only member of a class has rejected the plan, and the proposed treatment of that creditor's claim fails to meet the requirements of § 1129(b). The proposed 9 percent interest rate fails to provide the secured creditor the present value of its secured claim, and the proposed negative amortization is not fair and equitable in this case.

IT IS THEREFORE SO ORDERED.