**In re CONSOLIDATED PROPERTIES LIMITED PARTNERSHIP,**
**Debtor.**

**Bankruptcy No. 90–4–3408–SD.**

United States Bankruptcy Court,
D. Maryland,
at Rockville.

July 13, 1994.

Stephen E. Leach, Tucker, Flyer & Lewis, Washington, DC, for Consolidated Properties Limited Partnership, on behalf of Plan Sponsor.

Thomas Coughlin, Washington, DC, for beneficiaries.

John Spellman, Hopkins & Sutter, Washington, DC, for Citibank, F.S.B.

Kenneth Oestreicher, Whiteford, Taylor & Preston, Baltimore, MD, for Minnesota Mut. Life Ins. Co.

Bradley R. Duncan, Hunton & Williams, Fairfax, VA, for Hunton & Williams.

### *OPINION*

DUNCAN W. KEIR, Bankruptcy Judge.

The Debtor seeks confirmation of a Fourth Amended Plan of Reorganization pursuant to 11 U.S.C. § 1129(b). The Debtor is the owner of two real estate projects consisting of an office building known as Concord and a business park known as Dale City. The Concord Property is impressed by a first lien in favor of Minnesota Mutual and the Dale City Property is impressed by a first lien in favor of Citibank. There is also a second lien upon each property both of which liens are held by Crestar Bank, as successor trustee for the beneficiaries of a syndicated note.

The Debtor calculated the claim of Minnesota Mutual as of the date of the confirmation to be approximately $3,226,000.00, inclusive of all unpaid principal and interest which has accrued at the note rate of 13.75%. The same calculation is done for the claim of Citibank for an approximate claim in the amount of $1,460,000.00. The claim of Crestar, trustee for the trust beneficiaries, for the note secured by the second lien upon the Concord Property is approximately $821,-000.00, inclusive of interest accrued during the pre-confirmation period of the bankruptcy at the note rate of 14.75%, and for the note secured by the second lien upon Dale City, the outstanding amount is approximately $364,000.00.

■ At the time that the Debtor filed its Third Amended Plan of Reorganization, the second lien holder elected treatment for its claims pursuant to 11 U.S.C. § 1111(b) as governed by FRBP 3014. That Plan was not confirmed and thereafter Debtor filed its Fourth Amended Plan. The second lien holder did not move to withdraw its § 1111(b) election; and now asserts that its claims must be treated as secured pursuant to the election. The Debtor protests the applicability of the § 1111(b) election as to the Fourth Amended Plan of Reorganization, on the ground that an election for an earlier proposed plan, not confirmed, is not an effective election of a treatment under § 1111(b) for purpose of a subsequent plan.

An election of application of § 1111(b)(2) by a class of secured creditors may be made at any time prior to the conclusion of the hearing on the disclosure statement or within such later time as the Court may fix. FRBP 3014. The Advisory Committee Note to Rule 3014 states the rationale therefor as follows: "... it is important that the proponent of the plan ascertain the position of the secured creditor class before a plan is proposed." (Advisory Committee Note (1983)).

Moreover, at the making of the election, that election "becomes binding and the class may not thereafter demand different treatment under § 1111(b) with respect to that Plan." (Advisory Committee Note). "Only if that Plan is not confirmed *may* the class of *secured creditors* thereafter *change* its prior election. *Id.* (Emphasis added).

■ Bankruptcy Courts have further limited a secured creditor's right to withdraw its election, and allow a withdrawal only if the Plan has been materially altered. "The rule and comment clearly indicate that once the election is made, Debtor and any other creditors should be allowed to rely upon the election, absent a material alteration in the plan." *Matter of IPC Atlanta Ltd. Partnership,* 142 B.R. 547, 553 (Bankr.N.D.Ga.1992), *citing In re Keller,* 47 B.R. 725, 728–30 (Bankr. N.D.Iowa 1985). *See also In re Paradise Springs Assoc.,* 165 B.R. 913 (D.Ariz.1993); *In re Bloomingdale Partners,* 155 B.R. 961 (N.D.Ill.1993).

Not only has Crestar not affirmatively sought to withdraw its election by filing a Notice of Withdrawal, Crestar continues to assert the continuing viability of the election. At the confirmation hearing for the Fourth Amended Plan, Crestar relying on its earlier election, objected to confirmation because the plan failed to comply with § 1129(b)(2)(A)(i) with respect to its secured claim. The Debtor, however, argues that the § 1111(b) election automatically lapsed when its Third Amended Plan was not confirmed. The Debtor has not cited, nor has the Court found, any reported opinions wherein a debtor has advanced this argument. This Court finds that Crestar was not required to make second § 1111(b) election for its Class 2 and Class 4 claims, in the absence of an affirmative withdrawal of the original elections. The original elections are effective and dictate the required treatment of Classes 2 and 4 under the Fourth Amended Plan.

The result of Crestar's elections under § 1111(b) is that their claims are deemed fully secured for purposes of treatment under the plan of reorganization. In exchange for this right, the claims of the second lien holder are not entitled to any treatment for any deficiency beyond the property securing the claim, and hence cannot participate in distributions to unsecured classes of claims.

After the Fourth Amended Disclosure Statement was approved, the Debtor circulated ballots on the Fourth Amended Plan. According to the ballot tally submitted by the Debtor, each impaired class of claims and interest holders under the plan voted to accept the plan by at least the requisite 51% of the number of holders of claims in that class and two-thirds of the amount of debt held by claim holders of each class, with the exception of two classes. Classes 2 and 4 failed to accept the plan.

■ A question arose as to how the ballots for Classes 2 and 4 should be counted. Although throughout the preconfirmation history of this case, each beneficiary of the respective second lien trusts has been dealt with as a claimant for their respective fractional interest in the second trust notes, it appears that each of the two actual debt instruments are payable to a sole holder, the

trustee for the second lien beneficiaries in each respective trust. In its Schedule A–2—Creditors Holding Security, the Debtor listed the claims of the second trustholders. Therein, the Debtor listed the Creditor as Crestar Bank, and noted that Crestar was "trustee for below listed investors." Thereafter followed a list of all investors. Crestar, relying upon the Debtor's schedule, did not file a proof of claim.

A proof of claim or interest is deemed filed under § 501 for any claim or interest that appears in the schedules. 11 U.S.C. § 1111(a). Furthermore, that schedule shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless scheduled as disputed, contingent or unliquidated. It is not necessary for a creditor to file a proof of claim. FRBP 3003(b)(1). Neither Crestar nor the individual investors subsequently filed a proof of claim.

Pursuant to 11 U.S.C. § 1126(a), the holder of a claim allowed under § 502 may accept or reject a plan. This Court must determine who holds the Class 2 and Class 4 claims. Crestar's position vis a vis the individual investors is similar to a lead bank in a participation agreement.

> In a typical participation, the "lead" divides large loans into shares which it then offers for sale to other participating financial institutions. The lead is the only secured party. The "participants" can look solely to the lead for satisfaction of their claims because they are not themselves creditors of the borrowers and cannot assert creditor claims against the borrowers.

*Hibernia National Bank v. Federal Deposit Ins. Corp.,* 733 F.2d 1403 (10th Cir.1984) (citation omitted).

As the trustee or "lead", Crestar is the secured party. Unless the "participants", i.e. the individual investors, have played an active role with respect to the loan, they are not creditors. *Mason & Dixon Lines v.*

*First National Bank,* 86 B.R. 476, 480 (M.D.N.C.1988), *aff'd,* 883 F.2d 2 (4th Cir. 1989); *citing see, e.g., Ten Mile Indus. Park v. Western Plains Service Corp.,* 810 F.2d 1518, 1525 (10th Cir.1987) (participants acquire no rights against borrower because they are not creditors); *Depositors Trust Company of Augusta v. Frati Enterprises,* 590 F.2d 377, 379 (1st Cir.1979) (holder of note, not the 100% participant, is borrower's creditor).

As the sole holder of the two debt instruments, Crestar Bank is the holder of the claims, as trustee for the individual investors, therefore, only Crestar was entitled to vote the Class 2 and Class 4 claims for or against the Debtor's Plan.

The issues to be resolved in ruling upon the confirmation of the Debtor's Fourth Amended Plan, however, are not affected by this determination of who is the proper claimant for the second trust claims. If the individual beneficiaries had been held to be the holders of their fractional claims, the ballot tally submitted by the Debtor reflects that the holders of claims in Class 2 and Class 4 did not vote by over one-half of the holders and two-thirds of the amount held, in favor of the plan.[1] Crestar Bank, as trustee having failed to vote in favor of the plan, both of those classes have failed to vote in favor of the plan. Both Class 2 and Class 4 are impaired under the treatment under the plan, and as a result, Debtor cannot meet the requirement of § 1129(a)(8) which mandates that each impaired class must accept the plan. As a result, the Debtor is proceeding under § 1129(b)(1), which permits confirmation of a plan, not withstanding that one or more impaired classes have not accepted the plan, upon a finding that the requirements of Section 1129(b) are met. This procedure, of course, is commonly referred to as cramdown.

Crestar as the Class 2 and Class 4 creditor has also filed an objection to confirmation.

---

1. On Debtor's Summary of Acceptances or Rejections of Amended Plan filed on June 1, 1994, the Debtor reported the ballots cast by Classes 2 and 4 as follows:

| "As to Class 2": | Number | Percentage |
| --- | --- | --- |
| Accepted | 9 | 36% |
| Rejected | 16 | 64% |

| "As to Class 4": | Number | Percentage |
| --- | --- | --- |
| Accepted | 9 | 36% |
| Rejected | 16 | 64% |

Further, the Debtor summarizes the ballots by chart, indicating that as to Classes 2 and 4, Crestar Bank, trustee, rejected the Plan.

In its objections, Crestar asserts arguments that factually dispute the compliance of the Debtor with § 1129(b) and other requirements for confirmation. The assertions are that the plan is not fair and equitable and does not meet the requirements of § 1129(b)(2)(A)(i)(II). In addition at the hearing on confirmation, the objecting parties further protested that the interest rate used to calculate the amount of the claim of each of the first trust holders exceeded that which would be allowed by Section 506(b), and that the plan was not feasible.

In order to address each of these objections and to evaluate the Debtor's compliance with Section 1129(b), it is necessary first to understand the treatment which the plan affords to the first four classes. Class 3 is the first secured lien held by Minnesota Mutual on the Concord Property. The plan specifies that the claim shall be calculated by using the non-default note rate of 13.75% and adding to the outstanding principal all unpaid interest as of the date of confirmation. This claim will then bear interest on the total amount of the claim at a rate of 9% post confirmation. At the time of the hearing on confirmation, there was an outstanding rental reserve fund for the Concord Property in the amount of $540,000.00. Under the terms of the plan, $85,000.00 of that fund would be used to repair structural defects in the parking garage on the property, $225,000.00 would be paid to Minnesota Mutual and $125,000.00 would be used to pay pre-petition real estate taxes.

After application of the above-described funds from the rental reserve, the remaining claim of Minnesota Mutual would be amortized with interest at 9% with monthly payments required. The monthly payments due would be calculated on a 20 year amortization, but the maturity date would be reduced to a three year maturity. It is the intent of the Debtor to sell or refinance the Concord Property within the three year time period and fully retire the Minnesota debt.

Class 4 of the plan consists of the claim for the second trust debt on the Concord Property. The amount of the claim is defined in the plan as the outstanding principal plus accrual of all interest outstanding and unpaid at the note rate of 14.75% as of the date of confirmation. Thereafter, this claim would accrue interest at the rate of 9% until paid. The maturity date of the claim is at the end of three years. The Class 4 claim will be paid if, or when, the property is refinanced or sold. The plan does provide for a contingent interim payment from excess cash flow after satisfaction of the payments required to the Class 3 claimant and maintenance of the $125,000.00 reserve fund balance. The projections accompanying the Fourth Amended Disclosure Statement reflect that such excess cash flow payments will be minimal or nonexistent in the first two years of the plan.

The treatment of Classes 1 and 2 is similar in structure to that of 3 and 4. Class 1 consists of Citibank as holder of the note secured by the first lien upon the Dale City Property. The claim of Citibank receives the same treatment vis a vis the Dale City Property, as Minnesota Mutual's claim receives vis a vis, the Concord Property.

Class 2 consists of the claims secured by the second lien upon the Dale City Property. The treatment of this class is similar to that of Class 4, with the exception that there is no provision for interim excess cash flow payments. As a result, the plan calls for a complete negative amortization of the Class 4 claims.

As to the Complaint by Crestar that the interest rate used to compute the amount of the first lien claims on each of the properties is higher than that which should be permitted under 11 U.S.C. § 506(b), this issue has been decided in this case by the Order entered on March 16, 1993. In the Memorandum Opinion attached to that Order, the Court stated: "a base contractual rate of interest should be used for purposes of awarding interest to an over secured creditor under § 506(b), assuming there are no extreme countervailing factors present, such as illegality, or unconscionable self-dealing". *In re Consolidated Properties Ltd. Partnership*, 152 B.R. 452, 454 (Bankr.D.Md.1993). This decision is accorded the status of law of the case in this matter and will not be revisited by this Court.

■ The second issue raised by Crestar is that the plan is not feasible. In support of this argument, Crestar points to the fact that the projections which have been filed as exhibits by the Debtor varied from those projections and actual accomplishments which were earlier put forward by the Debtor in support of earlier versions of a plan. For example, for the period April 1994, the Debtor projected net operating income of $39,-475.00 for the Concord Property in those projections attached to Debtor's Fourth Amended Disclosure Statement filed in August of 1993. A recent update of those projections now projects the income to be $30,-916.00. In addition, Crestar argues that the leasing projections put forward by the Debtor are optimistic and that the actual expected revenues for the period of the plan will be lower. Crestar argues that adjustment for what it considers a more realistic projection will decrease the amount of anticipated value in the property and make unlikely a sale or refinancing which will pay off the second trust holder. For the reasons set forth below in the discussion on negative amortization, this Court finds that the risk that the second trust holder will not be paid in full is one which already exists. In light of that fact and the evidence put forward at the hearing, the Court finds the plan to be feasible.

■ Crestar also argues that the plan cannot be confirmed as a cramdown because it alleges the plan does not comply with § 1129(b)(2)(A)(i)(II) of the Bankruptcy Code. This section provides that the plan must be fair and equitable including the requirement, as to a class of secured claims, that the holder of such claims retain the lien securing the claim and receive on account of such claim deferred cash payments totalling at least the amount of the allowed claim. The amount of the allowed claim as to the Concord Note of Crestar is its total outstanding balance because of Crestar's election under § 1111(b). Thus, the plan must provide for payment of the note in full. This the plan purports to do, through the refinancing or sale of the project within the three (3) year term · of the plan. Furthermore, § 1129(b)(2)(A)(i)(II) requires that the present value, as of the effective date of the plan,

of the stream of payments must equal the value of the claim holder's interest in the estate's interest in the real property. In other words, the present value of the indebtedness by the Debtor to Crestar for the Concord Project as set forth in the plan, must equal the present value of the collateral interest which Crestar holds in the Concord property.

This collateral interest should be determined by the present value of the property minus all senior encumbrances thereupon. The Debtor seeks to value the property by capitalizing its projected income using a cap rate of 11%. Thus, the Debtor would determine the gross market value of the property by taking the net operating income of $30,-916.00 as of March 19, 1994, on its projections entered into evidence as Debtor's Exhibit No. 1 and multiply that times twelve months to calculate an annualized net operating income. This figure would then be divided by the cap rate of 11% resulting in a gross valuation of the property of $3,372,000.65, according to the testimony. From this evaluation, the Debtor would deduct brokerage fees, title and survey costs and legal and accounting costs which it projects, resulting in a net value of $3,225,212.00.

It would appear that in addition to the Concord Property, the first and second trust holders in the Concord Property are secured by the existing rental reserve. However, the testimony was that the stated amount of the Minnesota Mutual claim was calculated after application of the $225,000.00 which the plan proposes to make as a "down payment" to Minnesota Mutual. In addition, it is clear that the pre-petition real estate taxes in the amount of $125,000.00 would have to be paid before any sale of the property could be recorded. Finally, the value given by the Debtor and the rent projections contained in Debtor's Exhibit No. 1 were based upon a condition of the property after repairs to the garage were also funded from the rental reserve. Accordingly, the most that could be expected from the rental reserve would be $125,000.00.

Crestar attempted to cast serious doubt upon the value of the property by eliciting on

cross-examination the information that the cash flows for the months of April, May and June, 1994, were far below the projected revenues. Crestar argued that if that cash flow was considered income and the capitalization method were applied to an annualized cash flow, the property would yield only approximately $1,357,855.00 in value. Finally, the Debtor admitted in testimony that a liquidation value of the property would be significantly lower than the $3,225,212.00 projected market value. Based upon this testimony, this Court finds that the value of the interest of the Debtor in the Concord Property which stands as security for Crestar is in practicality and in fact zero. Accordingly, even though the present value of the treatment of Crestar claims treatment under the Fourth Amended Plan is little or nothing, it does not violate the second requirement of § 1129(b)(2)(A)(i)(II), because the present value of Crestar's collateral interest is also zero.

█ The last prong of Crestar's attack upon the plan is that it is a negative amortization plan and *per-se* not confirmable. A negative amortization plan is one in which the obligations under the plan to a class or classes of creditors increase by accrual at a rate in excess of the projected cash payments, to the end that the amount owed to the creditor under the plan will increase, rather than decrease through at least the initial phases of the plan.

> Negative amortization refers to 'a provision wherein part or all of the interest on a secured claim is not paid currently but instead it is deferred and allowed to accrue,' with the accrued interest added to the principal and paid when income is higher.

*Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1176 (9th Cir.1992), quoting in part from *In re Club Associates*, 107 B.R. 385, 398 (Bankr.N.D.Ga.1989). Although, some courts have held that negative amortization plans are *per-se* unfair and not equitable and hence fail to meet the requirement of § 1129(b)(1), see, *In re McCombs Properties VIII, Limited*, 91 B.R. 907, 911 (Bankr. C.D.Cal.1988), more recently the weight of authority is to reject such a *per-se* rule. *In re Oaks Partners, Ltd.*, 141 B.R. 453, 457 (Bankr.N.D.Ga.1992). In the *Oaks Partners*, the Court agreed with the Circuit Court of Appeals for the Ninth Circuit citing *Sierra Woods*, supra, and found that a plan of reorganization, including a negative amortization provision should not be rejected *per-se*. "However, the plan has to be scrutinized carefully." *Id.* at 457. This Court agrees with that statement.

█ By its very nature, a negative amortization provision has the potential to be extremely unfair and inequitable. Such a provision may shift significant economic risk onto the creditor which may bear most of the economic burden, should the plan ultimately fail. In order to maintain the present value of the stream of payments proposed under the plan, a negative amortization provision will include the accrual of interest. However, since such interest is accrued but not paid, the creditor bears substantial risk that at the very least it would not ultimately be paid that which would be required in order to produce a recovery at the present value. Indeed the risk may be higher because the passage of time may also jeopardize the creditor's recovery of the present value of its collateral since the condition of the collateral, or market fluctuations may deteriorate the collateral during the period of accrual. Only where it is clear that a negative amortization plan does not unduly shift the risk of loss to the creditor, should the Court find that it is fair and equitable.

█ The Courts in both *In re Oaks Partners*, supra and in *Sierra Woods*, supra cite with approval the ten factors listed in the 1991 decision in *In re Apple Tree Partners, L.P.*, 131 B.R. 380, 398 (Bankr.W.D.Tenn. 1991).[2]

**2.** 1. Does the plan offer a market rate of interest and present value of the deferred payments;
2. Is the amount and length of the proposed deferral reasonable;
3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or its the plan feasible;
5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

In the instant case, no argument was put forward that the 9% interest rate was not a market rate or that the length of deferral was unreasonable. Many of the remaining listed factors can only be determined with reference to the interest of the creditor which needs to be protected. That is, does Crestar hold an interest, the value of which is being unduly jeopardized by the negative amortization feature of the plan. The answer to this question as to the Concord Property is no. Having found that the present value of Crestar's interest in the Concord Property is zero, even a high risk imposed by negative amortization is not unfair or inequitable. Indeed, Crestar conceded in argument that it did not want this case to proceed to a conversion or liquidation because it would not expect to recover anything if that occurred. It appeared Crestar's chief goal was to somehow force a renegotiation of the plan payments to permit a "carve out" in favor of Crestar from the revenue reserve or other assets. However, this Court must determine whether or not the plan before it can be confirmed, rather than dictate alternative plan terms.

Even though the Debtor's plan appears speculative, and its projections optimistic, in light of the fact that Crestar's lien currently has no present value, the relatively high risks which this plan may impose are not unfair or inequitable.

This conclusion is also accurate as to the Dale City Property. As to that property, the treatment of Crestar is virtually identical to Crestar's Concord Property lien, discussed above. The only difference is that even the possibility of excess cash flow payments during the three years of negative amortization is not included for the Dale City claim. This difference is not material, given this Court's finding that it is highly unlikely that such payments would actually exist in the Concord Property. Furthermore, the present value of Dale City as reflected in the Debtor's Exhibit 2, is worse in terms of value available to Crestar as a second lien holder, then for the

Concord Property. Based upon a similar capitalization of projected net revenues, the Debtor ascribes a current value to the Dale City Property of $1,203,777.00 and a net value of $1,143,126.00. The current balance of the first mortgagee is $1,459,906.00 and so it is apparent that even upon the Debtor's optimistic projections, there is no value at the present time for the second trust held by Crestar. This of course, is even more true if the figures suggested by Crestar by cross-examination were adopted, which would yield a capitalized value of $796,909.00 based upon the Debtor's exhibits to an earlier cash collateral motion.

Even the Debtor's future projected value of Dale City remains below that necessary to ultimately pay off Crestar. This does present a problem to the Debtor for confirmation. The first part of 11 U.S.C. § 1129(b)(2)(A)(i)(II) requires that the plan provide for deferred cash payments totalling at least the allowed amount of the claim. Again, since Crestar has selected treatment under § 1111(b), the allowed amount of the claim is the outstanding amount of the indebtedness. The projections set forth in support of the plan show that it is not feasible under even the most optimistic projections to find that the plan will pay the full amount of the second trust debt.

At the hearing on confirmation, the Debtor sought to remedy this problem by attempting an oral modification of the plan to allow Crestar to cross-collateralize its Dale City Note to a third position against the Concord Property. Because the Debtor's projections at the end of year three show that there would be more than enough value in Concord to pay off both the first and the second trust on that property, the Debtor argues that this additional source of repayment makes the plan feasible and meets the requirements for a cash payment totalling at least the amount of the Dale City note.

Because such a modification could impose an additional burden on the unsecured credi-

---

6. Are the risks unduly shifted to the creditor;
7. Are the risks borne by one secured creditor or class of secured creditors;
8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and
10. Are there adequate safeguards to protect the secured creditor against plan failure.

tors in the Concord Project which hold claims in Class 6, this Court required that the modification be noticed to creditors with an opportunity to object. Certification of that notice has now been filed and no objections have been received. Therefore, the plan which the Court is considering is the Fourth Amended Plan as modified by this additional provision.

For the reasons as discussed above, as to the Concord Property, this Court finds that the Plan as modified, meets the dictates of § 1129(b)(2)(A)(i)(II) and that it is fair and equitable, despite the negative amortization feature.

Accordingly, this Court will enter an Order confirming the Modified Fourth Amended Plan of Reorganization.