### In re APPLE TREE PARTNERS, L.P., d/b/a Apple Tree Center, Debtor.

**Bankruptcy No. 90–25393–B.**

United States Bankruptcy Court, W.D. Tennessee, W.D.

Sept. 17, 1991.

William Thomas Newton, Glankler, Brown, Gilliland, Chase, Robinson & Rains, Memphis, Tenn., for debtor.

Thomas R. Dyer, David H. Jones, Walter, Dyer & James, Memphis, Tenn., for Leader Fed. Bank for Sav.

Julie C. Chinn, Asst. U.S. Atty., Memphis, Tenn.

MEMORANDUM OPINION AND ORDER ON CONFIRMATION OF DEBTOR'S PLAN, ON MOTION FOR RELIEF FROM THE STAY, ON § 506 VALUATION OF SECURED CREDITOR'S CLAIM, AND ON CONTINUED USE OF CASH COLLATERAL

WILLIAM H. BROWN, Bankruptcy Judge.

This opinion involves the primary question of whether the debtor's negative amortization plan of reorganization of a retail and office center may be confirmed under 11 U.S.C. § 1129(b). The opinion covers related issues which were addressed by the parties in the contested confirmation or related hearings, which began on April 1, 1991, and continued intermittently until July 16, 1991.

The Court has considered the extensive testimony of the parties' representatives, experts and other witnesses, the depositions submitted for evidentiary purposes, in excess of seventy exhibits, and the parties' memoranda of facts and law. This memorandum opinion contains findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure ("FRBP") 7052, and the issues presented are core. 28 U.S.C. § 157(b)(2)(B), (G), (K), (L), and (M).

HISTORY OF THE CASE

Apple Tree Partners, L.P. ("debtor"), a California limited partnership, purchased certain commercial property known as Apple Tree Center ("Center"), consisting of ten retail and office buildings and a 5.5 acre adjoining vacant lot from George T. Nickey ("Nickey") in 1988. The Center is located in Memphis, Shelby County, Tennessee. The debtor financed its purchase of the improved properties by obtaining two loans, one for $5.3 million on the retail center and one for $5.4 million on the office center, from Leader Federal Bank for Savings ("Leader"). The notes, secured by first mortgage deeds of trust, personal property security agreements, and assignments of rents were executed on November 30, 1988. The debtor filed its voluntary Chapter 11 petition on June 25, 1990. Its disclosure statement and plan of reorganization were filed on January 2, 1991, and amended on March 29, 1991. The debtor and Leader had entered into a consent order on July 27, 1990, for the debtor's temporary use of cash collateral consisting of rents; however, as a part of the contested confirmation process, Leader also objects to the debtor's continued use of cash collateral. Leader not only objects to confirmation of the debtor's plan [1] but also has moved for relief from the automatic stay in order to permit foreclosures. The U.S. Trustee also objects to confirmation. The debtor seeks confirmation by the cram down method provided under 11 U.S.C. § 1129(b).

1. There are no competing plans.

## ISSUES

This contested confirmation involves a negative amortization plan which raises the following issues as presented by the objecting creditor Leader:

1. Whether the debtor's plan has been proposed in good faith under 11 U.S.C. § 1129(a)(3);

2. Whether the debtor's plan satisfies the best interest of creditors test under § 1129(a)(7);

3. Whether the debtor's plan is feasible under § 1129(a)(11); and

4. Whether the debtor's plan is fair and equitable under § 1129(b)(2)(A).

The U.S. Trustee objects to the plan's provision for a post-confirmation injunction which appears to be coextensive with § 362(a)'s automatic stay.

The debtor has attacked the notes to Leader as permitting usurious interest rates, which attack is a part of the valuation proof before the Court under § 506. The Court will be required to determine the amount of Leaders' claim and its entitlement to interest, late charges, attorney's fees and expenses.

Based upon its findings of fact, the preponderance of the evidence, and its conclusions of law, the Court will deny confirmation.

## FINDINGS OF FACT

1. The debtor is a California limited partnership, whose managing partner is Bryson S. Randolph ("Randolph"). The general partners are Mr. Randolph and Werner GB, Inc. As noted above, the debtor's assets consist of a retail center and office center.

2. The Court approved, prior to the confirmation hearing, a sale by the debtor of the 5.5 acre vacant commercial lot adjacent to the Center to the Malco Theater, Inc. for the purpose of allowing the construction of a multi-screen movie theatre. This sale and development not only enhanced the retail center, it also produced funds suffi-

cient to satisfy the mortgage claim of Nickey on the vacant lot [2] and to pay $200,000 to Leader. The debtor proposes in its amended plan to apply this payment to reduction of Leader's principal obligations, which is in conformity with the terms of the loan commitments. (Confirmation Exs. 10 & 11)

3. The agreed cash collateral order of July 27, 1990, provided for a moratorium on interest payments from June 1, to December 1, 1990, and for minimum monthly payments of $91,000 to resume January 1, 1991. Those payments have not resumed and the debtor's amended plan proposes no resumption of payments until January 1, 1992. The order provided for a waiver of monetary defaults so long as the debtor complied with the order.

4. The debtor, under this Court's orders, pending confirmation, has utilized rental income for administrative expenses, operating expenses and tenant improvement costs.

5. Leader committed to make two separate loans to the debtor on October 31, 1988. (Confirmation Exs. 10 & 11) The commitments called for 80% loans to value, with interest at 1.50% above prime as set by the Citibank, N.A. published rate floating monthly. Interest only on the loans was payable monthly and the entire principal balance was due three years from the closing date. The first twelve months of the loans were treated as construction loans and the final twenty-four were treated as permanent but short term loans. Late charges of 6% on each monthly installment were required. Under the commitments the debtor was to provide a total of $1 million cash equity at closing and $1.5 million from a second lien lender or equity investor.

The loans were established with draw schedules to permit property and tenant improvements. Paragraph 42 of each commitment letter set out this schedule and anticipated twelve months of negative cash

---

**2.** Subsequently, the debtor and Nickey have settled their respective claims against each other.

*See* order dated August 20, 1991.

flow during the improvements. Net operating income ("NOI") was insufficient at the loans' inception to service the debt, but the mutual expectation was that NOI would improve.

The loan commitments provided that the loans were to be construed and governed under Tennessee law and the documents were to be prepared in conformity with Tennessee usury laws. The commitment letters were accepted by the debtor partnership and by the guarantor, Mr. Randolph, after negotiation between the parties. The debtor was represented by counsel in those negotiations.

The notes were executed on November 30, 1988, with one loan for $5.4 million secured by the office property (Confirmation Ex. 12) and one loan for $5.3 million secured by the retail property (Confirmation Ex. 13). Monthly interest payments began on January 1, 1989, and the total debt was due on December 1, 1991. The notes provided for the late charge of 6% on each late installment and for a default rate of interest if the note holder declared the note due and payable. Also, in the event of default, the notes called for reasonable attorney's fees, costs and expenses incurred in the collection of the notes.

The notes were secured by deeds of trust, security interests, and assignments of rents. (Confirmation Exs. 14, 15, 16 & 17) Paragraph 2.01 of each deed of trust defined "default" and "event of default," which definitions included failure to pay timely.

The notes were current when the debtor filed its bankruptcy petition.

6. When the debtor purchased this Center in 1988, it invested $1 million in equity capital, and an affiliated entity, South Bayshore Partnership, Ltd.[3] ("Bayshore") loaned $1.5 million which was secured by a second mortgage on the improved properties. Prior to the bankruptcy filing, the debtor's partners invested an additional $1.6 million for improvements to the property. (See Ex. 1, 2/11/91 hearing) From the Leader loans, $900,000 was reserved by the debtor for what was anticipated to be short term negative cash flow. However, the debtor spent more on cosmetic and tenant improvements than it had budgeted. (Confirmation Exs. 18, 19 & 20)

7. The debtor has improved the tenant quality, mix and rental base since acquiring the property. These efforts resulted in a temporary down-turn in occupancy rates as a result of tenant turnover, but the debtor has shown improvement during the Chapter 11 in occupancy levels. (See Ex. 2, 2/11/91 hearing) The debtor also attributed some of its early difficulty to a generally weak market, high competition, and defects in the construction of the buildings.

Jon Thomas Seiz, a witness associated with Trammell Crow Company, was involved with attempting to lease the Center for approximately one year after the debtor acquired the property from Nickey. The market strategy at that point was to try to attract an anchor tenant and more credible retail tenants, to increase rental revenues, and to convert the existing short term leases to longer and triple net leases (under which the tenant bore operating costs and tax increases). The debtor was dissatisfied and discharged Trammell Crow.

8. The debtor's partners are unable to invest further significant funds in the property at this time, and the plan does not call for a significant new injection of capital by the debtor or its partners.

9. Since the bankruptcy filing, from June to December, 1990, the debtor's partners have advanced $130,000 for tenant improvements, but the debtor had no other source of funds for tenant improvements or operation during the Chapter 11 except from rental income. Leader's cash collateral has funded $247,841 in tenant improvements for 1990 and through February, 1991. (Confirmation Ex. 6)

10. Mr. Randolph has prior experience with office and industrial properties, but this Center is his first ownership or management of a retail center or of a res-

---

**3.** Bayshore and the debtor share the same general partners, and Bayshore is the general part-

ner of Moriah Partners, Ltd., the debtor's limited partner.

taurant in such a center. The other general partner has prior retail experience.

11. The debtor viewed tenant improvement cost as a front-end expenditure rather than a capital improvement to be recaptured over a period of years. If the tenant improvement costs were amortized over the life of each lease, they would, at least as to some leases, contribute to a negative net income after interest payments on the secured debt. (Ex. 1, 4/16/91 hearing) There was some proof from James Ranier, an expert witness on commercial leasing associated with Cushman & Wakefield, one of the largest national commercial property brokers, that the debtor's tenant improvement costs were too high in relation to the rental income and expenses for the property, contributing to negative income after expected debt service. Mr. Ranier analyzed several of the debtor's leases and concluded that the debtor was losing money on many of the leases. Mr. Ranier's experience was that tenant improvement costs, while capital expenditures in the first year, should be amortized over the life of the lease.

12. Cushman & Wakefield publishes annual market trend analyses of Memphis office space, and the 1990 year-end publication was introduced. (Confirmation Ex. 46) Based upon those trends and upon his personal examination of the Apple Tree office center and some leases (Confirmation Ex. 48), Mr. Ranier classified this office property as a B— because of its age and type of construction. His analysis of the debtor's competitors in the office market revealed a general negative leasing activity between December 1989 and March 1991. (Confirmation Ex. 47) Apple Tree, however, was the exception, with a positive office leasing activity for that period. (*Id.*) Mr. Ranier conceded that the debtor's office center had the potential for reaching 90–95% occupancy within two years.

13. Pending confirmation, Leader retained the right to approve tenant improvement costs and new tenants. In the absence of its approval, the Court has ruled on those issues.

14. Aaron E. Balkin, an appraiser originally employed by Leader but then called as a witness by the debtor, placed a fair market value on the retail center, as of August 13, 1990, of $8.9 million (which he corrected in testimony to $8.734 million) and on the office center of $8.450 million. (Ex. 3, 2/11/91 hearing and Confirmation Ex. 7, 4/1/91 hearing) Mr. Balkin utilized the traditional three approaches to valuation: the market, cost and income approaches. Interestingly, for the retail property, the three approaches led to value estimates within a range of less than 1%. (Confirmation Ex. 7, p. 47, Retail Appraisal) For the office property, the three value estimates fell within a range of less than 5%. (*Id.*, p. 48, Office Appraisal) Mr. Balkin determined that the income approach was most indicative of the value of these properties, recognizing that an appraisal is an *estimate* of value. The income approach for such commercial income-producing properties involves a capitalization of the net income, either realized or reasonably expected, from the property. The capitalization rate is arrived at by the appraiser after consideration of what rate of return on investment is expected by sophisticated investors. (Confirmation Ex. 7, p. 42, Retail Appraisal) Mr. Balkin also looked at two present value calculations: the stream of rental income discounted to present value and the sale of the property at the end of an assumed ten year holding period, which sale was also discounted to present value. (*Id.*, p. 43)

Mr. Balkin defined the discount rate as that "rate at which the net income representing the return on the investment in real estate is discounted to derive a present worth estimate." (*Id.*, p. 45, Retail Appraisal) After considering a current survey of institutional investors and the Cushman & Wakefield reports on local commercial properties, Mr. Balkin arrived at a discount rate of 12.5%. (*Id.*) The Cushman & Wakefield reports (Confirmation Ex. 8) reflect what investors would like to receive as a return on an investment. Mr. Balkin was familiar with investors in the market such as Cushman & Wakefield and the Weston Companies. Insurance reports uti-

lized by Mr. Balkin reflect historical actual returns on investments.

Mr. Balkin established a 10% capitalization rate after considering "market data and related sources," which rate was used by Mr. Balkin to "convert the projected eleventh year net operating income into a likely selling price at that time." (*Id.*, p. 45) In establishing the capitalization rate, which is created by the market, Mr. Balkin relied upon three sources: The American Council of Life Insurance, which ranged from 8.9 to 9.2%; the Cushman & Wakefield May 1990 report, which ranged from 8 to 10%; and his own records of local sales of commercial property. He selected the 10% capitalization rate to be applied to eleventh year NOI notwithstanding his recognition that investors reflect their perception of risk in a higher capitalization rate. Mr. Balkin's opinion was that a 10% capitalization rate applied at the end of a ten year holding period was justified because the risk would be diminished.

Mr. Balkin further testified that, under the debtor's plan and when the entire note was due Leader, the value of the entire Center, based upon capitalization of the net income, would increase to $23 million. (Confirmation Ex. 50A)

Mr. Balkin's estimates of value are estimates of fair market value which is defined in his written reports. (Confirmation Ex. 7, pp. 1–2) Fair market value is not the equivalent of liquidation value under a forced sale scenario.

Mr. Balkin followed certain guidelines, including those of the American Institute of Real Estate Appraisers ("MAI") and Resolution Trust Corporation ("RTC"). However, Mr. Balkin conceded that he did not necessarily abide by all of Leader's internal guidelines for appraisals, none of which guidelines were introduced into proof. Leader criticized the Balkin appraisal through testimony and Confirmation Exhibit 33. (*See* testimony of Mr. Ritz and Mr. White) In a September 19, 1990 memorandum to participating lenders, Leader characterized itself as having "an extensive history" with Mr. Balkin's appraisals, which had "always been considered very conservative." (Confirmation Ex. 39)

15. Mr. Balkin's opinion of fair market value assumed good management, and he was impressed that the debtor's management ranged from good to excellent.

16. Mr. Ed Simmons, an appraiser called by the debtor, agreed with Mr. Balkin's methodology including the use of the income approach for income-producing properties, and he agreed with Mr. Balkin's fair market value. However, Mr. Simmons testified that because of market changes since August 1990, he might use a 12% discount rate, rather than the 12.5% used by Mr. Balkin.

17. Mr. Wallace E. White, an MAI appraiser, now with Cushman & Wakefield, who was called by Leader, testified concerning the Cushman & Wakefield real estate outlook reports. The reports are prepared from information gathered from institutional lenders and major investors. The purpose of the reports is to generally inform the industry about market conditions, including capitalization rates. He testified that higher risks called for higher capitalization rates and that those rates have a relationship to NOI and property values. Between May, 1990 (Confirmation Ex. 54) and September, 1990 (Confirmation Ex. 55), the Cushman & Wakefield reports reflect a generally upward trend in capitalization rates. Mr. White testified that in order to come up with a capitalization rate for the debtor's property, he would survey the market for actual capitalization rates and that in his appraisals, such actual rates would be documented in his working file.

18. The outlook for the Center is enhanced by the present construction of Nonconnah Parkway, a new major road close to the Center, which road provides access to the I–240 expressway loop.

19. The debtor anticipates that cash accumulating in the cash collateral account through December, 1991, will be sufficient for expected tenant improvements.

20. Mr. Randolph testified that if the minimum payments to Leader were missed, the automatic stay would be lifted to per-

mit foreclosure. However, the amended plan is not specific on that point.

21. Mr. Randolph testified that the original Leader loans were made at an actual 75% of the appraised values at the time of closing in November, 1988, rather than the required 80%.

22. The debtor introduced a pro forma, prepared by Mr. Randolph, of its monthly income, expenses, loan balance and ratio of loan to value, beginning January, 1991, and continuing through December, 1995. (Confirmation Ex. 1; *compare* Confirmation Ex. 29) This document shows a January, 1991 loan to value ratio of 65.52%, with a peak of 73.55% in December, 1993, a levelling off in 1994, and a December, 1995 ratio of 72.97%. This document assumes a beginning principal balance of $11.3 million, as of January, 1991, upon which interest accrues and is calculated at a fixed amount monthly from January, 1991 through December, 1994. The plan's new amortization then begins in January, 1995. The debtor's Confirmation Exhibit 1 does not compound the accruing interest.

23. The debtor conceded that present cash flow was insufficient to service Leader's debt; however, the plan anticipates, based upon assumptions of increasing rent levels and leasing targets, that cash flow will improve so as to permit the plan payments to be made to Leader.

24. The debtor's pro forma (Confirmation Ex. 1) reflects the beginning of $50,000 monthly partial interest payments in January, 1992, which annualized amount is approximately 5% of the principal balance, an interest rate below market. The $70,000 monthly partial interest payment beginning in July, 1992, when annualized, is approximately 6.8% of the principal, again below market. The $90,000 monthly partial interest payment beginning July, 1993, when annualized, is approximately 8% of the principal, again below market. In January, 1994, the pro forma projects an interest payment of $93,625 on an accumulated balance of principal and accrued but unpaid interest of $12,804,500, which annualized payments would not yield a present market rate of interest. A full interest payment at contract interest is not to be paid until January, 1994. This is a negative amortization plan.

25. The Leader loans have personal guaranties by the general partner Mr. Randolph who has been sued by Leader on his guaranties. (*See* Confirmation Exs. 10 & 11)

26. The debtor has undergone changes in management and leasing agents since its acquisition of the property. The debtor's plan proposed to pay its leasing agent a commission of 7% of gross rents, a percentage that is higher than the market rate of 4 to 5%. The debtor justified this rate as an incentive to focus the agent's attention on leasing in Apple Tree.

27. Most of the recent and current leasing has been through Mr. David Disney, the debtor's manager. As a result, the debtor has saved lease commissions.

28. The debtor, in competing with the leasing market, frequently allows tenants up to four months free rent.

29. In a three year projection of NOI (Confirmation Ex. 2), prepared on August 8, 1988, the debtor projected average occupancy to increase from 77% in 1988 to 95% for 1991. Further, average rent per square foot was projected to increase from $10.50 in 1988 to $11.30 for 1991. The 1989 NOI of $1.26 million was expected to increase to $1.53 million for 1991.

30. In an August 16, 1988 addendum to Confirmation Exhibit 2, the projected NOI was broken down by each quarter in the years 1989 through the first quarter, 1992. (Confirmation Ex. 3) This document projected 95% occupancy by the end of the first quarter of 1990.

31. The debtor's adjusted occupancy in March 1991 was 79% for the office side and 54.6% for the retail side. (Testimony of Randolph; Confirmation Ex. 49)

32. Leader's analysis of the debtor's leasing history reflected a general improvement in office occupancy percentages but an unstable and generally downward trend in retail occupancy percentages. (Confirmation Exs. 34, 35, 36 & 37) Throughout

the Chapter 11 process, the debtor has aggressively sought leasing opportunities.

33. Although the debtor had not met its prior budgets or projections, Mr. Randolph testified that the debtor now knows more about the properties' potential, that the debtor had solved many of its prior problems, and that there were fewer unknown factors to deal with. From all of the projections, budgets, and pro forma presented to Leader by the debtor (Confirmation Exs. 6, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29 & 30), Mr. Mike Ritz ("Ritz"), Leader's officer in charge of the debtor's loans, prepared a summary (Confirmation Ex. 31) of NOI for 1989, 1990 and 1991. The summary reflects frequent deviation between what the debtor had projected and what was actually achieved. Leader did not believe that the debtor attempted to mislead the lender but did believe that the debtor had made errors in its projections.

34. The debtor has made no effort to sell the Center since acquiring it in 1988. However, the debtor is willing to sell the property.

35. In a liquidation analysis, Mr. Randolph testified that the unsecured creditors would receive nothing in the event of foreclosures by Leader.

36. Mr. Disney, the debtor's manager and in-house leasing agent, testified that the leasing goals were realistic and that the debtor was in fact ahead of its leasing projections. Historically, the debtor had not been enforcing its tenant expense stops or recoupments under its leases because of market conditions, but in 1990 the debtor billed the tenants from 25% to 33% of excess expenses. In 1991, the debtor expects to bill for 50% of expense overages, and in 1992, the debtor expects to pass through to the tenants 100% of expense overages.

37. The debtor has been providing Leader with monthly reports of the cash collateral account and of tenant improvement activity. (See, e.g., Confirmation Ex. 6) Prior to bankruptcy, the debtor had provided monthly management reports. (Confirmation Exs. 4, 5, 24 & 25)

38. The debtor, in 1990, requested of Leader additional financing to pay off the $1.5 million second liens and to meet a $900,000 "shortfall" estimated through December 31, 1990. (Confirmation Ex. 22) This request was rejected by Leader.

39. On May 10, 1990, Mr. Randolph prepared a financial status and projection which reflected a current combined negative cash flow of $48,000 per month before further needed tenant improvements. Assuming 95% leasing by June, 1991, this memo projected a continuing negative cash flow for the following year. Notes on Mr. Randolph's report utilized an 11% capitalization rate to arrive at present value. (Confirmation Ex. 26) Mr. Ritz, in his testimony, estimated that it could take four or five years to reach 95% occupancy, and he expressed doubts about the debtor's ability to ever reach that level. Mr. Ritz thought that a stabilized occupancy of 90–93% was more reasonable.

40. Leader introduced as Confirmation Exhibit 32, a chart of the debt due Leader, assuming a total principal of $10.7 million on July 1, 1990, the first month the debtor failed to make its payment to Leader. The chart assumed that the rate of interest would level off in 1991 and through January, 1995 at 10.5%, and the chart assumed that a monthly late charge of 6% and attorney's fees would accrue. Assuming the $200,000 payment from the vacant lot sale and assuming the graduated plan payments through January 1, 1995, when the newly amortized $120,000 loan payments would begin, the chart reflects the loan increasing from a $10.7 million balance to $14.3 million in January, 1995. As of March 1, 1994, the loan would exceed the debtor's maximum cap of $13.928 million. As of November 14, 1990, before the debtor's plan was filed, a Leader loan analyst estimated that the loan to value ratio protected against any loss. (Confirmation Ex. 40) At the point of the debtor's bankruptcy filing, Leader estimated net present value, based upon a five year income approach with 11% capitalization rate and 11.25% discount rate, of $6,266,050 for the office center and $5,533,279 for the retail center. (Confirmation Exs. 41 & 42) Mr. Ritz testified that he now knew more about the debtor and

did not believe that the debtor could perform according to its plan projections. (*Compare* Confirmation Ex. 43)

The debtor prepared and introduced an analysis of the plan's treatment of Leader's secured claims, without inclusion of late charges and attorney's fees, which reflects that all accrued interest (at 10.5%) eventually will be paid. (Confirmation Ex. 51) Under the debtor's analysis, which included both a 10.5% discount and capitalization rate, the Leader debt would increase to $13.340 million during the plan (Confirmation Ex. 52A), but the debt would always be well below the property's fair market value. (Confirmation Ex. 53A) The debtor's Confirmation Exhibit 51, however, shows the debt to increase to a high of $13.480 million in the fourth year of the plan.

In rebuttal, Leader introduced its analysis of Exhibit 51, in which the debtor had used a 10.5% discount rate rather than Mr. Balkin's 12.5% rate. (Confirmation Ex. 60) Leader's Exhibit 60 annualizes the interest rate of the debtor's plan payments and calculates the present value of the debtor's plan payments, using the debtor's 10.5% discount rate, to be $11,782,185. Using a 12.5% discount rate, Leader calculated the present value of the debtor's plan payments to be $10,467,750. (Confirmation Ex. 61) Leader's Exhibit 62 calculates the loan beginning July 1, 1990, with contractual interest, late charges, attorney's fees, and the debtor's plan payments, at a 12.5% discount rate, to have a present value of $10,789,334. (*See* also Confirmation Ex. 63, making similar calculations but beginning with a loan balance as of July 1, 1991.)

41. Mr. Ritz expressed an opinion that discount and capitalization rates were going up (to the 13% range) rather than down since the Balkin appraisal. The present difficulties in obtaining financing for commercial property contributed to that opinion.

42. Mr. David C. Peck, an expert witness with extensive experience in commercial and retail property and leasing testified that the Memphis office market was soft at the present time, that the Apple Tree office buildings were of a B— class compared to competing optimal office space, that tenant improvements did not add significant value to the property, and that the value of the debtor's office center was $45 to $50 per square foot. He strongly doubted that the Center could be sold now because no market existed for the sale of such space and financing was not available.

As to the retail center, Mr. Peck testified that it lacked an anchor tenant that would attract other tenants, that the retail market in Memphis was moderately soft, and that the new Malco theatre would not be a negative factor but neither would it be a strong positive factor.

Mr. Peck prepared a pro forma based upon his assumptions on rental rates, vacancy rates, operating expenses, annual tenant turnover percentage, tenant improvement costs (which he would amortize over the lease life), 5% lease commission, and replacement reserves for capital expenditures, which pro forma utilized a 12% capitalization rate. Mr. Peck's resulting valuations were based upon a practical, business oriented income approach. His opinion of the retail center value was $6,169,250 and the office center value was $4,691,000. (Confirmation Ex. 44) However, based upon his opinion that there was no permanent financing available on this property under today's market conditions, Mr. Peck testified that the actual value in the "real world" of the retail center was $3.5 to $4.0 million and the office center was $4 million. Mr. Peck was not offered as an appraiser but rather as a comparable business experience witness. Mr. Balkin testified on rebuttal that Mr. Peck's valuation did not represent fair market value but rather an "asking price" based on present conditions.

Mr. Peck expressed a lack of confidence in the future of this Center, but he certainly conceded that the market for office and retail space could change in the future. He also testified that the amount of debt on a property is generally irrelevant to its value but that debt service must be considered in a cash flow analysis.

43. Mr. Ranier, of Cushman & Wakefield, testified that he would market the debtor's office center in the $4.5 million range, based upon an NOI for the first quarter of 1991 of $512,000 and the utilization of a 12% capitalization rate.

44. Mr. Seth Stewart Werner, a partner in Bayshore, testified by deposition that there is "no financing around today" and there is uncertainty as to whether any buyers exist. Therefore, fixing a capitalization rate as of March 1, 1991, is difficult. "Cap rates are a function of the financing available in the market, debt or equity and the relative risk of the project." (Werner deposition, pp. 38–40)

45. A lower capitalization rate results in a higher value.

46. The debtor's plan assumed that the discount rate and interest rates would be the same but that each would float according to the contractual terms throughout the plan's life. Nevertheless, the debtor's projections in its confirmation exhibits utilized a stable 10.5% discount and interest rate.

47. The debtor has attacked the notes as being usurious under Tennessee law. Leader calculated its secured claims, in Confirmation Exhibit 66, to include contractual interest, a 6% monthly late charge, attorney's fees, and expenses. Mr. Ritz testified that he understood the notes to permit accumulation and compounding of unpaid interest, late charges and expenses.

48. The debtor's position was that late charges were not due and were not accruing.

49. The debtor's amended plan provides, in pertinent part:

a. Class A consisting of administrative claims is unimpaired.

b. Class B consisting of two wage claims is to be paid in full upon the effective date of the plan. This class accepted.

c. Class C consisting of real property taxes is unimpaired. The debtor proposes a monthly escrow for future accruing taxes.

d. Class D consisting of the two secured claims of Leader is impaired. Leader voted two rejections of the plan, as amended, which provides that the secured claim as to the office complex is $5.4 million and as to the retail complex is $5.3 million. However, as a part of the confirmation and § 506 hearings, the debtor conceded that the amount of Leader's secured claims would be established by the Court. The amended plan provides for Leader to retain its secured interests and to apply the $200,000 from the Malco sale to principal reduction. (The loan commitments from Leader provided that any funds from such a sale would be used to "pay down" the loans. See Confirmation Exs. 10 & 11, ¶ 8) Interest shall accrue on the Leader debt which is conceded to be oversecured, but interest payments shall be deferred until January 1, 1992, which is established as the "commencement date," after which partial monthly interest in the amount of $50,000 shall be paid through June, 1992; $70,000 through June, 1993; $90,000 through December, 1993; and $93,625 through December, 1994. As of January 1, 1995, the debtor proposes to begin to pay interest and principal on a newly amortized debt consisting of the $10.7 million principal, deferred and unpaid interest, and § 506(b) fees and expenses. This new debt shall be paid in monthly payments of $120,000 at the original floating pre-default contractual interest rate.

The plan further covenants that the total Leader debt will not be allowed to exceed $13,928,000, which is 80% of the $17,410,000 fair market value of the two properties as fixed by Mr. Balkin.

A lump sum payment of the balance is called for on the eighty-fifth month after January 1, 1992.

Provided the debtor does not default in these plan terms, any prepetition default (which the debtor denies exist) are deemed to be cured. A twenty day late payment cure period is allowed.

Should the debtor sell either the office or retail center, all net proceeds shall be paid to Leader to be applied to principal reduction. Leader's consent to a sale free and clear of its liens is not required; however, the sale must net a sufficient amount to satisfy Leader's secured claim on the property sold. A sale of one property shall not effect an acceleration of the remaining debt on the other property. In the event of a sale of one property, the monthly payment to Leader shall be reduced by one-half.

The debtor will continue to furnish Leader with advance notice of tenant improvement costs and with monthly operating reports.

Prior to the January 1, 1992, commencement date, the debtor shall escrow net operating income into an interest bearing cash collateral account, from which account the debtor may pay all administrative expenses, to be approved by the Court, tenant improvement costs, and leasing expenses. The plan fixes lease commissions at 7% and tenant improvement costs at $8 per square foot for office space, $10 for retail space, and $38 for specialty space.

e. Class E consists of the impaired second mortgages claims, against the office and retail centers, held by Bayshore, which accepted the plan. Bayshore's total claims are $1.5 million. Bayshore, an insider, will retain its second mortgage liens and junior security interests. Interest will not accrue on the principal until after the forty-eighth month after the plan's effective date (which is eleven days after entry of a confirmation order), and interest, accruing then at the pre-default contractual rate, shall not begin to be paid until the debtor has successfully met its first eighteen $120,000 monthly obligations of the new Leader amortization schedule. All principal and accrued interest due Bayshore shall be due and payable on the same date that Leader's lump sum balance is due.

f. Class F consists of the claims of Nickey, which have now been settled and satisfied in full.

g. Class G consists of unsecured claims of less than $10,000 which shall be paid in full at ten percent interest by the sixtieth day after the plan's effective date. Nine creditors in this class each voted an acceptance of a total of $3,701.70 in claims.

h. Class H consists of the unsecured claim of the insider Moriah Partners, Ltd. ("Moriah") in the amount of $795,-500. The claim shall not be paid until all senior claims have been paid in accordance with the plan terms. Moriah accepted the plan.

i. Class I consists of the unsecured claim of the insider Bryson S. Randolph, in the amount of $795,500. Treatment of Class I is identical to that of Class H, and Randolph accepted the plan.

j. Class J consists of the secured claims of the insiders Moriah and Randolph arising out of the cash collateral order, under which each insider has a claim for $55,000. The two insiders accepted the plan in this class. Payment shall begin on a monthly basis six months after the commencement of the plan's new amortized payments to Leader have successfully been made. At that point, the two class members shall be paid on a pro rata basis from available net operating income. Unspecified interest shall accrue on these debts.

k. Class K consists of the equity interests of the general and limited partners, who accepted the plan. The partners shall retain their respective interests as set out in the original and unaffected partnership agreement. The plan does not provide for a new injection of capital by this class.

l. The plan is to be funded from rental income and the sale of the vacant lot. In addition, the general partners will loan up to $20,000 to satisfy Class G unsecured claims, which loan shall be repaid at ten percent interest, assuming that all other claims are paid. The net proceeds from the sale of the va-

cant lot, after payment of the Nickey claims and the $200,000 to Leader, shall be available for plan execution and administrative claims.

m. Title to all property is to be revested in the debtor subject only to the secured claims provided for in the plan and allowed by the Court.

n. The debtor is to receive a discharge except for those debts provided for in the plan.

o. The plan provides for retention of jurisdiction by this Court for several purposes, including the determination of whether any defaults have occurred under the plan.

p. The current management by the debtor's employees is to be retained.

q. The plan's effective date is the eleventh day after entry of a confirmation order.

r. Article IX of the plan provides for an injunction as to all creditors, so long as the debtor is not in default of the plan, "to the same extent provided by 11 U.S.C. § 362."

## DISCUSSION AND CONCLUSIONS OF LAW

The provisions of 11 U.S.C. § 1129(a) provide that "[t]he court *shall* confirm a plan only if *all* of the" requirements of § 1129(a) are met. (Emphasis added) Leader has placed into issue the following subsections:

**11 U.S.C. § 1129**

(a) The Court shall confirm a plan only if all of the following requirements are met:

(3) The plan has been proposed in good faith and not by any means forbidden by law.

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; ...

(11) Confirmation of the plan is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed under the plan ...

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property ...

All other impaired classes, except Leader's Class D, have accepted the plan; therefore, the Court can find that the requirements of § 1129(a)(10) are met. The Court also finds that §§ 1129(a)(1), (2), (4), (5), (6), (9), (12), and (13) are either met or are not applicable to this debtor or plan. Obviously, all impaired classes have not accepted;

therefore § 1129(a)(8) is not met, but the debtor seeks confirmation under § 1129(b), the alternative or cram down method. *In re U.S. Truck Co., Inc.*, 800 F.2d 581, 583 (6th Cir.1986). There is no unsecured deficiency provided for as to Leader, which is treated under the plan as oversecured; therefore, no § 1111(b)(2) election was made by Leader. The plan in fact proposes to pay 100% of all creditors' claims and the unsecured Class G accepted; therefore, there is no absolute priority rule problem under § 1129(b)(2)(B).

■ The debtor of course has the ultimate burden of proof and persuasion that the plan is capable of confirmation. *See, e.g., In re Keaton*, 88 B.R. 154, 156 (Bankr. S.D.Ohio 1988).

### SECTION 1129(a)(3)

■ The creditor's arguments concerning the lack of good faith in this plan proposal are inseparable from its over-all argument that the negative amortization plan does not meet the requirements of §§ 1129(a)(7) and (11) and § 1129(b)(2)(A). In determining good faith of a plan, the court's inquiry begins with the plan itself and proceeds to examine all of the facts and circumstances in an effort to determine "whether the plan will fairly achieve a result consistent with the Bankruptcy Code." *In re Madison Hotel Associates*, 749 F.2d 410, 425 (7th Cir.1984). Some courts have expressed this test as being a question of whether "the plan was proposed with 'honesty and good intentions' and with a 'basis for expecting that a reorganization can be effected.'" *Kane v. Johns–Manville Corp.*, 843 F.2d 636, 649 (2nd Cir.1988), *quoting In re Koelbl*, 751 F.2d 137, 139 (2nd Cir.1984) and *Manati Sugar Co. v. Mock*, 75 F.2d 284, 285 (2nd Cir.1935); *see also, e.g., In re Sun Country Development, Inc.*, 764 F.2d 406 (5th Cir.1985).

■ After an examination of this proposed plan and its attendant facts and circumstances, this Court can find and conclude that the plan was proposed in good faith. Merely because the plan seeks to negatively amortize Leader's secured debt does not alone ·offend the Bankruptcy Code's concept of reorganization nor "abuse the spirit of the Bankruptcy Code." *In re Caldwell*, 895 F.2d 1123, 1128 (6th Cir.1990); *quoting, Public Finance Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir. 1983). The debtor has demonstrated in this contested hearing a good faith effort in its confirmation attempt.

In essence, this is a single asset case, consisting of one commercial center with a retail and office section, with few and relatively small unsecured claims, with few employees, and with the debtor's primary dispute being with its largest secured creditor. These factors, coupled with imminent foreclosure at the time of the bankruptcy filing, have led some courts to find bad faith in many single asset filings. *See e.g., In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir.1988). However, there is a difference in a bad faith motive in filing the bankruptcy and the good faith test for a plan confirmation under § 1129(a)(3). This debtor was current with Leader when its voluntary bankruptcy was filed; therefore, there was no imminent foreclosure. In fact, there was no allegation that this bankruptcy was filed in bad faith so as to taint the plan itself.

Whether the Court confirms this plan depends not upon § 1129(a)(3), but upon the other issues presented under §§ 1129(a)(7) and (11) and § 1129(b)(2)(A).

### SECTION 1129(a)(7)(A)(ii)

This test essentially calls for a liquidation analysis and a comparison of what the nonaccepting holder of an impaired claim would receive or retain under the plan with what that creditor would receive in a Chapter 7 liquidation. This is commonly called the best interest of creditors test. *See,* legislative history to § 1129(a)(7) as reported in NORTON BANKR.CODE PAMPHLET 1991–1992 Ed., pp. 919–22. As previously stated, Leader is treated in this plan as oversecured and § 1111(b)(2) does not come into play. All other impaired classes have accepted the plan and Leader is the only nonaccepting claimant. Leader is clearly impaired under the plan because its payments are deferred; therefore, under the language of § 1129(a)(7),

the best interest test must be applied to Leader.

Leader asserts that the debtor did not put on any proof of a liquidation analysis and that such proof is necessary in order to satisfy the best interest of creditors test. *See, e.g., In re Valley Park Group, Inc.,* 96 B.R. 16, 23 (Bankr.N.D.N.Y.1989) (The Court noted an absence of a liquidation analysis). This plan, however, proposes to pay 100% of the claim of Leader, as that claim is allowed by this Court. There is proof in the record which suggests that the present market conditions render the secured property worth less than Leader's debt. (*See, e.g.,* testimony of David C. Peck) The Court is not persuaded to follow that evidence completely, and the Court will find that Leader is presently oversecured. (*See,* discussion on § 506, *infra*) However, assuming, for liquidation purposes, that the property is worth less than Leader's debt, clearly this 100% plan offers to pay Leader more than it would receive in a forced or depressed market liquidation sale.

Leader also asserts that the Court must fix a present value for the stream of payments to be paid under the plan in order to determine if Leader is actually receiving as much or more under the plan as it would in liquidation. That is correct and the Court will address present value in the context of its discussion on § 1129(b)(2)(A), in which the Court will find that the present value to Leader of its future payments does not equal or exceed its present secured claim. A duplicative discussion is not required in the present § 1129(a)(7)(A)(ii) analysis because the concept is the same in both sections. *In re Edgewater Motel, Inc.,* 85 B.R. 989, 995 (Bankr.E.D.Tenn.1988). Because of the conclusions reached under § 1129(b)(2)(A), the present value requirements of § 1129(a)(7)(A)(ii) also are not met.

In summary, the plan proposes a 100% payment of Leader's allowed claim with interest. The only proof of present liquidation value is that in today's conditions there is no current market or financing available for the property. Leader's representative testified that Leader had no plans for the property if it were permitted to foreclose. The proof is that the commercial real estate market in Memphis is currently depressed. Thus, it could be inferred that a current liquidation would yield less than 100% on Leader's allowed secured claim. As will be seen in the discussion to follow, that alone does not permit confirmation of this plan.

### SECTION 1129(a)(11)

This provision boils down to a feasibility question; that is, is the proposed plan feasible or is it more likely that the plan will be followed by liquidation or a new Chapter 11 case. There are some serious questions raised by Leader as to the feasibility of this plan. There is also proof in the record which demonstrates that the debtor has provided good management and has made progress in improving and leasing the Center. There is proof that the debtor reasonably may be expected to reach optimal occupancy within the life of the plan. However, the debtor historically has not produced sufficient cash flow to service the secured debt, requiring the partners to exhaust their ability to inject additional capital. The Court is not required to determine feasibility in light of the Court's conclusion that the requirements of § 1129(b)(2)(A)(i) and § 1129(a)(7)(A)(ii) are not met. However, the Court would agree with Judge Richard Stair's conclusion that "[w]hile the debtor projects a sufficient income to meet the payment proposed ..., in view of the substantial amount of payments deferred by the debtor, ... [the court] is not satisfied as to the ability of the debtor to meet these projections." *In re Edgewater Motel, Inc.,* 85 B.R. at 997. "[F]easibility involves the question of emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success." *In re Rota,* 1990 WL 90968 (Bankr.E.D.Pa.1990), p. 3, quoting 5 COLLIER ON BANKRUPTCY ¶ 1129.02[11] at p. 1129–36.11. This debtor has failed to meet its prior projections and its hopes for success are based upon all things working favorably for the debtor. Unfortunately, many economic factors are out of the debt-

or's control. Historically and economically, there is insufficient foundation for the debtor's assertion that it can meet its plan projections and payments. The Court more easily could accept the debtor's optimistic projections if the debtor was injecting significant new capital, if the debtor was assuming some of the risks of failure and/or if this was a shorter term negative amortization plan. But the risks all fall upon the creditor which is required by the plan to make a new loan with a significant negative amortization and increase in amount, and with the primary assurance of success being the debtor's equity cushion and optimism, which are not buttressed by any new risk on the debtor's side. Moreover, the debtor's basis for success depends upon the debtor's continued use of the rents which further depletes Leader's collateral. Under all of the circumstances, including the Court's following discussion of negative amortization, the Court can not find this plan feasible.

## SECTION 1129(b)(2)(A)(i) AND NEGATIVE AMORTIZATION

The debtor requested confirmation under the cram down provisions of this section because § 1129(a)(8) was not satisfied. Section 1129(b)(2) establishes the *"minimal* standards that the plan must meet" in order to be fair and equitable under § 1129(b)(1). *In re Manion*, 127 B.R. 887, 890 (Bankr.N.D.Fla.1991). In meeting the minimal requirement of fair and equitable treatment of Leader's secured claim, it first must be noted that the debtor's plan is treating Leader as being oversecured. The debtor's position is that its plan proposes, in good faith, to pay 100% of its creditors' claims and that a liquidation in today's depressed commercial real estate market would satisfy Leader but would be detrimental to all other classes of creditors. Further, the debtor asserts that if its plan fails, Leader is protected by a large equity cushion. The Court should observe that, except for Leader and relatively minor unsecured claims in Class G, the plan largely affects claims of insiders and a few employees of the debtor. Leader is obviously the largest creditor in amount of claims and the creditor at most risk if the plan fails.

■ In assessing whether negative amortization plans may be considered to be fair and equitable to an oversecured creditor, this Court is not prepared to adopt a *per se* rule that such a plan could never be fair and equitable. *See, In re McCombs Properties VIII, Ltd.*, 91 B.R. 907, 911 (Bankr.C.D.Cal.1988) ("You cannot defer the very interest payments that create present value and have a present value of a stream of deferred principal payments.") Rather, this Court concedes that a negative amortization plan *may* be considered fair and equitable to the affected class of secured creditors but that an analysis of all of the facts and circumstances of each case is required in order to reach such a finding. *See generally* Schermer and Bartz, "Negative Amortization And Plan Confirmation: Is It Fair And Equitable Under § 1129(b) Of The Bankruptcy Code?" 8 BANKR. DEV.J. 1, 7 (1991) ("Schermer"). At the same time, "negative amortization [may be] highly suspect when evaluating a plan's compliance with the cram-down requirements." *In re Club Associates*, 107 B.R. 385, 298 (Bankr.N.D.Ga.1989).

Section 1129(b)(2)(A)(i) does not define the methods of payment for a. fair and equitable plan. But, if the payments are deferred, the obvious impact of any amortization of the deferred payments must be analyzed. "In the mortgage context, [amortization] means a gradual retirement of the principal of the debt." Haines, "Negative Amortization," 8 NORTON BANKR.LAW ADVISER (August 1990), p. 4, *citing* Stern, NEW INVESTOR'S GUIDE TO MAKING MONEY IN REAL ESTATE (1976). "[N]egative amortization means that the principal amount of the debt increases over time because interest is not paid at the same rate it accrues, and the unpaid portion is added to the principal." *Id., citing* Terry, DICTIONARY FOR BUSINESS AND FINANCE (1989).

One court has suggested that the factors for consideration of whether a fair and equitable negative amortization plan exists are:

1. The length of the post-confirmation deferral of interest,
2. The amount of interest to be deferred after confirmation,
3. The amount of principal and interest deferred and capitalized after confirmation,
4. The ratio of debt to value of collateral during the term of the deferral, [and]
5. The nature and quality of the collateral, including consideration of whether the value of the collateral is appreciating, depreciating or remaining relatively stable.

*In re Spanish Lake Associates*, 92 B.R. 875, 878 (Bankr.E.D.Mo.1988); *see generally* Schermer, p. 8. In *Spanish Lake* that Court observed that the plan proposed a deferral until the seventh year, that the plan forced the lender to make a $1 million loan for deferred and capitalized interest for eleven years, and that it would take eleven years "for the level of debt to return to where it was on the date of confirmation." 92 B.R. at 879. The ratio of debt reached a peak of 86.5%. *Id.* And "[t]he risk of any shortfall rest[ed]" with the lender. *Id.* In concluding that the seven year deferral before it was not fair and equitable, the *Spanish Lake* Court concluded that "[r]equiring [the lender] to wait seven years before the debtor began paying the full 10% plan interest rate, when the figures suggest a risk of financial deficiency, is unduly burdensome." *Id.*

From the *Spanish Lake* analysis, this Court would suggest other appropriate factors to consider are:

1. Whether the debtor's financial projections are reasonable and sufficiently proven (which may be the equivalent of a feasibility test), and
2. Whether the risk shifted to the lender is "unduly burdensome." *Id.*

As Chief Judge George C. Paine observed in *In re Memphis Partners, L.P.*, 99 B.R. 385, 388 (Bankr.M.D.Tenn.1989), "[t]he problem is that in the early years of such [negative amortization] financing the creditor is at risk of not receiving the present value should the plan end prematurely."

In *Memphis Partners* there was no equity cushion to protect the lender from the risks of plan failure, and that Court concluded that it was not fair and equitable for the plan to take over eight years before the principal balance dropped below the original principal. *Id.*

The Schermer article suggests that courts which have found negative amortization plans to be fair and equitable based their finding upon the following factors:

1. [T]he period of post-confirmation interest deferral remained relatively short. (*citing, In re Club Associates*, 107 B.R. 385, 400 (Bankr. N.D.Ga.1989) (Negative amortization was a risk originally bargained for by the lender and the plan extended that risk five years.); and *In re Hollanger*, 15 B.R. 35, 47 (Bankr. N.D.La.1981) (Deferral of arrearages for seven years was reasonable, but the creditors would receive full interest during the deferral.); *see also In re Rota*, 1990 WL 90968 (Bankr. E.D.Pa.1990) (The deferral was for one year, at which time the secured creditors would be paid in full with interest.);

2. [T]he ratio of debt to value of collateral was small. (*citing, In re Rota*, 1990 WL 90968 (The debt to collateral ratio was 1.3 to 1.); *In re Club Associates*, 107 B.R. at 399 (The ratio had improved from an original loan ratio of one to one to a projected "substantial equity cushion.");

3. [T]he value of the collateral was expected to remain relatively stable. (*citing In re Rota*, 1990 WL 90968 (The objecting creditors were to be paid in full within the plan's first year or the property would then be surrendered, and the value was expected to remain "fairly stable."); *In re Club Associates*, 107 B.R. at 399 (After reduction of the principal from postpetition payments, "the remaining balance due is fully secured and is projected to remain so, even with the accrual of post-confirmation un-

paid interest, over the term of the Plan."); and/or

4. [T]he original agreement between the parties provided for negative amortization over the life of the loan. (*citing, In re Club Associates*, 107 B.R. at 399).

Schermer at p. 9.

The Schermer article goes on to state that of those courts which have found negative amortization to be neither fair nor equitable, the following factors influenced those decisions:

1. [T]here were inadequate safeguards against the plan's failure. (*citing, In re D & F Construction, Inc.*), 865 F.2d 673, 676 (5th Cir.1989) (Lender was forced to extend further funding, with deferral of substantially all principal for fifteen years, based upon speculation that the "Fort Worth, Texas real estate market will improve substantially."); *In re Memphis Partners, L.P.*, 99 B.R. at 388 ("[T]he property contains no equity cushion to reduce ... risks."); *In re EFH Grove Tower Associates*, 105 B.R. 310, 313–15 (Bankr. E.D.N.C.1989) (Despite excellent management, the property's value was inadequate to protect undersecured lender against risks while the debtor assumed minimal risks.); *In re Spanish Lake Associates*, 92 B.R. at 879 (Debt to value ratio would reach 86.5%, putting the risk of failure on the creditor.);

2. [T]he length of interest deferral was excessive. (*citing, In re D & F Construction, Inc.*, 865 F.2d at 676 (Negative amortization extended twelve years.); *In re 222 Liberty Associates*, 108 B.R. 971, 994–95 (Bankr. E.D.Penn.1990) (Principal payments were deferred ten years.); *In re Spanish Lake Associates*, 92 B.R. at 878–79 (Deferral for seven years and eleven years for debt to return to amount at confirmation was excessive.); *In re Edgewater Motel, Inc.*, 85 B.R. at 998–99 (More than 41% of payments were deferred until the eighth year.); *In re Anderson Oaks (Phase I) Limited Partnership*, 77 B.R. 108, 110 (Bankr.W.D.Tex.1987) (Five years delay in any payments and twelve years for debt level to return to level at confirmation was excessive.);

3. [T]he plan barred the creditor's foreclosure rights. (*citing, In re D & F Construction, Inc.*, 865 F.2d at 676);

4. [T]he interest rate provided in the plan was inadequate. (*citing, In re 222 Liberty Associates*, 108 B.R. at 994–5 (Court found the interest rate to be "insufficient."); *In re Aztec Company*, 99 B.R. 388 (Bankr. M.D.Tenn.1989) (An undersecured creditor was offered less than a market rate.); *In re Park Avenue Partners Limited Partnership*, 95 B.R. 605, 613–15 (Bankr.E.D.Wis.1988) (Debtor's faulty projections, deferral of interest, nonreduction of principal and speculation about upturn in value did not support interest rate proposed.); *In re Edgewater Motel, Inc.*, 85 B.R. at 997–98 (Interest rate proposed was less than market rate.); and/or

5. [T]he plan was not feasible. (*citing, In re Century Investments Fund VII Limited Partnership*, 96 B.R. 884, 890–91 (Bankr.E.D.Wis.1989) (In a stay relief and adequate protection hearing, court theorized that a possible negative amortization plan would not be justified because of inadequate income.).

In applying any of these factors, it must be emphasized "that determining whether a negative amortization provision is fair and equitable under Section 1129(b) is a factually intensive exercise." Schermer, p. 10. It is difficult if not impossible to construct "general, universal rules." *Id.* However, application of the suggested factors, plus additional factors which this Court finds to be appropriate, aids in structuring an analysis of the facts in the present case. Moreover, the minimal test of fair and equitable for secured claims under § 1129(b)(2) is a nonexhaustive list of

what is required to constitute fair and equitable treatment. *See, In re Edgewater Motel, Inc.,* 85 B.R. at 998.

## FACTORS TO EVALUATE WHETHER A NEGATIVE AMORTIZATION PLAN IS FAIR AND EQUITABLE TO OVERSECURED CREDITOR

■ From the above discussion and authorities and from this Court's own analysis, it seems appropriate to consider the following factors in evaluating whether this plan provides fair and equitable treatment to Leader's oversecured claim:

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating, or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against plan failure.[4]

■ Each of these elements has been analyzed in conjunction with the facts and circumstances of this case, which is made difficult by the fact that some factors are favorable in whole or in part to the debtor. This is not, in other words, a plan which is easily decided against confirmation. Rather, the Court has evaluated all of the facts and has balanced the above factors, which balance favors the secured creditor and does not favor confirmation.

## DOES THE PLAN OFFER A MARKET RATE OF INTEREST AND PRESENT VALUE OF THE DEFERRED PAYMENTS?

As an oversecured creditor, Leader is entitled to its contract rate of interest from June, 1990, when the last payment was made by the debtor until the effective date of the plan, which is defined in the plan as being the eleventh day after entry of a confirmation order. However, upon the effective day, Leader is entitled to a market rate of interest. Sections 1129(a)(7)(A)(ii) and 1129(b)(2)(A)(i) require a calculation of the present value of the plan's stream of payments, and "present value assumes the use of *market* rates of interest (as distinguished from the rate specified in the contract) for loans of similar duration, with similar security, and with similar rates." *In re Gene Dunavant & Son Dairy,* 75 B.R. 328, 335 (M.D.Tenn.1987), *citing* 4 COLLIER ON BANKRUPTCY (15th Ed. 1985) ¶ 1129.03[i] and *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982); *see also U.S. v. Arnold,* 878 F.2d 925 (6th Cir.1989); *In re Aztec Co.,* 107 B.R. 585 (Bankr.M.D.Tenn.1989). In the present case there was no proof offered on the market rate of interest for the new loan which the debtor proposes to force upon Leader by cram down. Rather, the plan proposes to retain the contractual floating rate of interest of 1.5% over Citibank's prime rate. This may or may not be the market rate, but the Court can not assume that it is equivalent to or exceeds the market rate. The contractual rate does not take into account the new risks which this plan places upon the lender. "The forced nature of the loan may warrant an additional premium to insure present value." *In re Memphis Partners, L.P.,* 99 B.R. at 387. The only proof relating to

---

**4.** This Judge has engaged in theoretical discussions concerning negative amortization with the Honorable Keith M. Lundin, United States Bankruptcy Judge for the Middle District of Tennessee, from which discussions some of these factors may have emerged. Credit may be owing to Judge Lundin who may not choose to accept such credit.

market conditions was that there is no available financing for similar property at this time. *See, In re Edgewater Motel, Inc.,* 85 B.R. at 996. The original loans were for short terms and were made under different market conditions than exist today. The Court can not conclude on the basis of the record that it is fair and equitable that Leader should be required to loan the debtor in excess of $11 million at the original contract rate.

Without a finding that market interest is being paid, it is difficult to reach conclusions as to whether the negatively amortized loan will discount to a present value which in turn would satisfy both §§ 1129(a)(7)(A)(ii) and 1129(b)(2)(A)(i). There was conflicting proof at trial about the appropriate discount rate, and this Court understands that discount rate is a different measure than interest rate. Discount rate is a term for an "annual percentage rate that reflects the competitive rate of return on an investment. The term is used to distinguish a rate of return on an investment from the rate of interest (interest rate) on borrowed funds." Boyce, REAL ESTATE APPRAISAL TERMINOLOGY (1975), p. 67 (Confirmation Ex. 64). The discount rate must be an appropriate "annual percentage rate applied at compound interest to a future income payment (flow or lump sum) to convert it to present worth estimate." Kinnard, INCOME PROPERTY VALUATION, p. 175 (Confirmation Ex. 65). The debtor used a 10.5% discount rate, being the same rate as the projected interest, and there was testimony that if the discount rate mirrors the interest rate the resulting calculation always yields a present value equal to the beginning principal. There was proof from Mr. Balkin that a discount rate of 12.5% was appropriate in his appraisal work but in his rebuttal testimony, Mr. Balkin stated that use of the same discount rate (10.5%) as the accruing interest rate (10.5%) was necessary in order to reflect the present value of money earning 10.5% interest. (See Confirmation Ex. 60) The Court has difficulty accepting this as a truism in view of the convincing evidence from Mr. Simmons' testimony that a 12% discount was appropriate under current market conditions, from Mr. Ritz's testimony that both discount and capitalization rates have moved upward since the Balkin appraisal, from Mr. Balkin's use of a 12.5% discount rate in his appraisals, and from Leader's Confirmation Exhibits 61, 63 and 66 which demonstrate that at a 12.5% discount rate the present value of the debtor's plan payments would not equal the beginning debt shown in those exhibits. The Court can not conclude that the present value of the debtor's proposed deferred payments equals the allowed amount of Leader's claim as of the effective date of the plan. (*See* discussion under § 506 *infra*)

## IS THE AMOUNT AND LENGTH OF DEFERRAL REASONABLE?

Assuming that the contract rate is a current market rate, this plan of course proposes to "totally restructure" the original loans. *In re Edgewater Motel, Inc.,* 85 B.R. at 993. These loans were due in full on December 1, 1991, and the plan proposes to extend the balloon payment date until February 1, 1999. In the meantime, interest will accrue but go unpaid until January 1, 1992, at which time a partial interest payment of $50,000 will begin. It is not until January 1, 1995, that the plan contemplates a full interest payment being made.

Under the debtor's projection (Confirmation Ex. 51), the secured debt would grow from a present approximate amount of $11.7 million to $13.480 million. (Compare Confirmation Ex. 52A) The debtor argues that Leader is protected by a large equity cushion which the debtor projects will increase. (Confirmation Ex. 53A) The debtor's projection is premised upon the contractual interest rate rather than a market rate. Further, the debtor's projection is based upon a discount rate of 10.5% for present value and upon no accrual of late charges from the time of the bankruptcy filing or throughout the plan. The debtor assumes that the $120,000 payment to begin on January 1, 1995, will amortize the then existing balance. Leader's Confirmation Exhibits 32, 60, 61, 62, 63, and 66 persuade the Court that the debtor's pro-

jections are questionable as to their reliability. Assuming the rate of interest remained at 10.5% and that late charges of 6% were permitted from July 1, 1990, until the plan payments begin in January, 1992, it is doubtful that the $120,000 projected in 1995 would amortize the loan. (*Compare* Confirmation Ex. 60) Clearly, as Confirmation Exhibit 62 illustrates, if attorney's fees and late charges accrue until late 1994, the projected $120,000 would not amortize the new loan. Obviously, if the floating rate of interest increased above 10.5%, the debtor's projections would be more doubtful and the negative amortization would increase.

As it is, the debtor proposes to defer payments of at least $2.5 million in interest (*see* Confirmation Exs. 61 & 62 for accruing interest), at the rate of 10.5%, and to defer payment of all the present loan balance of $11.7 million (*see* Confirmation Exs. 51 & 61) until the balloon payment in 1999. The only justification offered by the debtor is that Leader is protected by an increasing equity cushion. During the life of the plan, the debtor would be using Leader's other collateral, the rents, to pay administrative expenses, operating and other expenses, tenant improvement costs, and the plan payments. The debtor would not be injecting any new capital, other than the minimal amount of up to $20,000 loaned from the general partners to pay unsecured creditors. The fact that the debtor would continue to use the rent collateral during the plan, while deferring payments to Leader, further impairs Leader's security. *See, e.g., In re Landing Associates, Ltd.,* 122 B.R. 288, 296 (Bankr.W.D.Tex.1990) ("[A]n assignment of rents confers rights which have discrete value apart from the underlying deed of trust interest in the real property generating those rents.")

The loan balance would increase from an initial $10.7 million, which has never been reduced, to a high, by the debtor's projections, of $13.480 million. (Confirmation Ex. 51) Under Leader's projections, the loan would increase to $14.3 million in January, 1995. (Confirmation Ex. 32) Under the debtor's analysis, the loan balance would be $13.3 million when the total came

due under the plan. (Confirmation Ex. 51) While the plan calls for gradually increasing interest payments, the fact remains that the plan payments will never positively amortize the present loan balance. This is a negative amortization for seven years with an assumption that the debtor will be capable of refinancing, selling or otherwise paying the increased balance at the end of seven years. The length of the negative amortization, coupled with the amount of the interest deferral, the absence of any principal reduction, the amount of the increase in the balance, the continued use of the rent collateral, and the large amount of loan balances involved make this plan incapable of being fair and equitable to this creditor, which bears the risks of failure as its loan balance dramatically increases.

### IS THE RATIO OF DEBT TO VALUE SATISFACTORY THROUGHOUT THE PLAN?

Assuming that the debtor's proof is accepted and that the present fair market value of the two properties total $17.184 million, the debtor's pro forma indicated a January, 1991, debt to value ratio of 65.52%, with a peak of 73.55% in December, 1993, and a December, 1995 ratio of 72.97%. (Confirmation Ex. 1) While these ratios on their face appear reasonable, they are based upon other assumptions in the debtor's plan: that the value is in fact $17.184 million, that the value will increase during the plan, that the interest rate will remain at 10.5%, and that the debtor will meet its projections of occupancy levels and net operating income. Moreover, the debtor's basic assumption must be that the debtor will make its projected plan payments; otherwise, the negative amortization would worsen and the debt to value ratios would deteriorate.

If the debt to value ratios were the only factor for the Court's consideration and assuming that the Court accepted the debtor's proof totally and rejected Leader's proof, this factor would be favorable to the debtor. However, the Court can not let the debt to value ratios, which are based upon optimistic, if not speculative, assumptions,

outweigh all other negative factors. Furthermore, the Court has determined the present fair market value of Apple Tree Center to be a maximum of $16.0 million, which is less than the Balkin appraisal. (*See* discussion under § 506 valuation, *infra*) As a result, the debt to value ratios will increase. Moreover, as discussed previously, Leader has additional security in the rents, which are being permanently depleted to make plan and operational payments. This amounts to Leader making a new loan each month to the debtor from which the debtor will operate and negatively amortize Leader's increasing loan. This use of Leader's rent collateral, under all of the facts and circumstances, increases the debt to value ratio, as the value of Leader's rent collateral is diminished.

## ARE THE DEBTOR'S FINANCIAL PROJECTIONS REASONABLE AND SUFFICIENTLY PROVEN?

The Court has already concluded that this plan is not feasible. The debtor's projections have not been met in the past, and while the Court commends the debtor's efforts during the Chapter 11 process, the Court can not accept, without serious doubt, the debtor's present projections. Some proof favors the debtor in this area; for example, the proof supported that the debtor could reasonably be expected to meet its occupancy projections within the plan's life. Further, there is proof supporting the debtor's good management; for example, the debtor has leased at a higher rate than its competition and the debtor has a low rate of default by its tenants. However, as previously discussed, the proof offered by Leader cast doubt upon the debtor's projections, and the Court can not find that the debtor proved by a preponderance of the evidence that its projections are sufficiently reliable.

Historically, the debtor has overstated its leasing expectations and while there was credible testimony that the debtor could be expected to reach its optimal occupancy rate within the plan's life, there was also credible testimony that the debtor was losing money on many of its existing leases. Leasing which results in a net loss is not a positive factor. The debtor historically has not been able to service the debt on the Center from the NOI and the debtor's plan relies on its leasing expectations for sufficient income in the future. As previously noted, the debtor is not making a new capital investment. There are no contingency reserves in the debtor's budgets other than the tenant improvement account which is funded by the rents on which Leader holds an assignment. The prior management reports do not support a finding that the debtor will have sufficient net cash flow to make the plan payments to Leader.

## WHAT IS THE NATURE OF THE COLLATERAL, AND IS ITS VALUE APPRECIATING, DEPRECIATING OR STABLE?

Section 506 Valuation [5]

Discussion of this factor of necessity involves a valuation of the collateral for purposes of this confirmation. The debtor, of course, offered proof through Mr. Balkin, a qualified and certified appraiser, that the office portion of the Center had a fair market value of $8.450 million and that the retail portion had a fair market value of $8.734 million. (Confirmation Ex. 7) Appraisals, of course, are, as Mr. Balkin testified, *estimates* of value, based upon numerous assumptions. "What appraisers are valuing (or predicting) is what someone would be willing to pay to *own* the property and enjoy the fruits." *In re Landing Associates, Ltd.*, 122 B.R. at 297. As not-

---

**5.** § 506(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

ed in the findings of fact, Mr. Balkin used the three traditional approaches to valuation of real estate: market or comparable sales, replacement cost, and income.

No one approach by itself yields the true value of the property. Income-producing property is not merely worth the present value of a net income stream. Current real estate market conditions and the cost of construction also must be taken into account. Appraisers can only derive sensible discount rates for developing an anticipated income stream by evaluating the price for which other properties are now selling (an indicator of the level of risk the current marketplace will support). Similarly, replacement costs, if low enough in a recessionary market, can affect one's conclusions about the value of an income stream because an investor who could build a new building for little enough to generate similar income might not even be willing to buy an existing building. The three approaches are co-dependent as well as co-indicative. The Appraisal Foundation, *The Uniform Standards of Professional Appraisal Practice*, Standard 1 (1987).

*Id.* at 296.

Mr. Balkin concluded that the income approach was most reliable as an indicator of value for income-producing commercial property, and there was general agreement on that conclusion. "The income approach [used by appraisers] measures the *ability* of the property to produce a return on investment (via an income stream) that would justify a buyer's paying the indicated market value to own the property." *Id.* at 297. Mr. Balkin's three value approaches were within a close range of each other, a fact which lends credibility to his appraisal. Mr. Balkin was an excellent witness, but the Court was also favorably impressed by the testimony of other experts, Mr. White, Mr. Ranier and Mr. Peck, each of whom had practical experience with commercial properties. The Court understands that there is a difference in fair market value and the price at which a realtor may attempt to market the property, but the Court can not ignore the compelling testimony that there is no present market for this property due to the absence of available financing and the general market conditions. This reality must adversely affect the valuation under § 506(a), recognizing that this Court is not necessarily required to accept an appraiser's fair market value. Rather, the Court is required by the Code to determine a value "in light of the purpose of the valuation." 11 U.S.C. § 506(a). Here, the valuation is for the purpose of confirmation. The debtor concedes that Leader is over-secured, but the Court can not accept that the value for confirmation purposes is the Balkin combined amount of $17.184 million. In view of the debtor's attempted negative amortization, the Court will take what it considers to be a more practical and realistic approach to whether Leader is protected by the equity cushion alleged by the debtor and testified to by Mr. Balkin. The Court is concerned that Mr. Balkin's appraisal was performed as of August 13, 1990, one year ago. Mr. Balkin clearly reaffirmed his opinion in the confirmation and related hearings, but Mr. Balkin did not alter the 10% capitalization rate or the 12.5% discount rate which he had used in August, 1990.

The Court is persuaded by the testimony of Mr. Ritz, Mr. Simmons, Mr. White, Mr. Ranier and Mr. Peck that market conditions have changed since the Balkin appraisal. As Mr. Werner, a partner in Bayshore, said: "Cap[italization] rates are a function of the financing available in the market, debt or equity and the relative risk of the project." (Werner deposition, p. 40) The Court is persuaded that Mr. White, Mr. Ritz, Mr. Ranier and Mr. Peck properly looked to today's market in arriving at an appropriate capitalization rate, and the Court is persuaded that a 12% capitalization rate is more appropriate than Mr. Balkin's 10% rate. The witnesses agreed that a lower capitalization rate results in a higher valuation. Therefore, utilizing Mr. Balkin's appraisal calculation except for the application of a 12% capitalization rate to the eleventh year's NOI (*see* Confirmation Ex. 7, p. 46, Retail Appraisal and p. 49, Office Appraisal) the Court finds that the

maximum value of the office portion is $7.8 million and the maximum value of the retail portion is $8.2 million for a combined maximum value of $16.0 million. The Court is not comfortable with a conclusive finding that the proof, taken in its entirety and by a preponderance of the evidence, establishes the value at $16.0 million. The Court was impressed with the business and market approach of Mr. Peck who fixed the combined value, based upon an income approach, at $10.86 million, which the Court suspects is a more realistic present day value. The Court is persuaded by the evidence that Mr. Balkin's appraisal is questionable to some extent due to some inappropriate comparable sales looked to by Mr. Balkin and his use of dated discount and capitalization rates. However, Mr. Balkin's approach to valuation does assume a ten year holding period rather than an immediate sale, and for reorganization confirmation purposes, it is more appropriate to utilize an approach that assumes a holding period.

Due to the Court's doubts concerning the debtor's proof of value, for confirmation purposes the Court will not find but will assume that the value is $16.0 million. On the surface it would appear that Leader is protected by an equity cushion. Leader's debt is approximately $12 million, leaving an assumed present equity cushion of $4 million. However, the Court is not convinced that the Center will hold its assumed value. There is persuasive evidence that no real market for financing or sale exists at the present time. An absence of a potential market will eventually adversely affect the value. There is competition in the immediate area for both retail and office space. While there are many encouraging things happening in and close to the Center, there was also an expression of lack of confidence in the Center's future by credible expert witnesses. It is difficult for this Court to comfortably rely upon an equity cushion to protect Leader against the risk of plan default when this Court struggled with whether it should have accepted Mr. Peck's "real world" value of $10.86 million. It is difficult to rely solely or primarily for protection against risk of

failure on an equity cushion which in reality is based upon an appraiser's assumptions. Schermer, p. 11. Moreover, as Leader argued:

Balkin's task is to report the market; whereas, Ranier and Peck are in the market. In the present real estate economy, and especially when the solution to the problem is a negatively amortized loan, the Court should consider the opinions of the real players, Ranier and Peck, over that of the historian, Balkin.

Leader's Brief in Objection to Confirmation, p. 40.

In view of the uncertainty of the present and future markets for financing and sale of this Center, the Court concludes that the equity cushion could disappear suddenly and that it provides no real protection to Leader from risk of failure in this negative amortization plan. The theory of an equity cushion is comforting but the reality of no market for this property erodes the comfort level. Therein lies the difficulty with reliance upon appraisal values which speak of a willing buyer and a willing seller. The convincing testimony before the Court is that there are no willing buyers at the appraisal value or perhaps at any reasonable value at this time. How then may a paper equity offer real protection to Leader?

There can be no assurance that the equity will remain or grow to protect Leader as its debt grows in this plan. The Court is not comfortable in a negative amortization of this magnitude with cramming down confirmation solely on the predictions of an appraiser. Nor is the Court satisfied that the proof established by a preponderance of the evidence that the value of this property would increase or remain stable. To illustrate the uncertainties with the equity cushion, the plan provides that the debtor may sell one or both portions of the Center, without Leader's consent but satisfying Leader's liens. However, if the debtor sells one portion, there is no assurance that the remaining portion will be worth its share of the debt. The sale of one portion could adversely affect the value of the remaining portion.

Section 506(b).[6]

Further, any real equity cushion will be eaten into by the negative amortization and by attorney's fees and expenses to which the oversecured creditor will be entitled under § 506(b). And, this Court concludes that Leader is entitled under § 506(b) to contractual interest on its claim from the last interest payment made in June, 1990. Because the plan will not be confirmed, the Court does not need to determine a market rate of interest, which as previously discussed, the Court is unable to do based upon the lack of proof.

The debtor says that the beginning balance for the plan is $11.8 million (Confirmation Ex. 51) without attorney's fees, expenses and late charges. As an oversecured creditor, Leader is clearly entitled to reasonable attorney's fees and necessary expenses because the same were called for under the loan documents, including the trust deeds, which provided for attorney's fees in the event of default, or failure to pay timely, or in the event of any legal proceeding or dispute. 11 U.S.C. § 506(b) (Confirmation Exs. 14 & 15) The amount of the fees and expenses is currently before the Court in a separate hearing. The debtor says that the loans were not in default when the bankruptcy was filed and that Leader is not entitled to its attorney's fees in the absence of an event of default. However, under the loan documents, an event of default is only one contractual grounds for fees to the creditor. The Court concludes that under the contracts between the parties, Leader is entitled to its reasonable attorney's fees and necessary expenses.

The Court has also concluded that Leader, as an oversecured creditor, is entitled by the language of § 506(b) to its 6% late charges to be charged once each month from July, 1990 (the month after the debtor last made a payment). This is a part of the contractual charges in the agreements negotiated by the parties. *See, e.g., In re*

*Dalessio,* 74 B.R. 721, 724 (9th Cir. BAP 1987); *In re LHD Realty Corp.,* 726 F.2d 327, 333 (7th Cir.1984); *In re Neusteter Realty Co.,* 79 B.R. 30, 34 (D.Colo.1987). The late charges must be reasonable to be allowable. *In re Dalessio,* 74 B.R. at 724.

The contract clearly provides for late charges and the Court does not read the documents as allowing usurious rates. Because the Court is not confirming the debtor's plan, it is unnecessary for the Court to rule on the usury issues. However, there is no evidence that Leader has charged or ever intended to charge usurious rates. For federal savings and loan institutions such as Leader, state usury laws are preempted by 12 U.S.C. § 1463(g). This act permits Leader to charge the most favored lender rate in Tennessee, or up to the maximum effective rate of 24% per annum permitted under the state Industrial Loan and Thrift Companies Act. *See* Tennessee Code Annotated § 45–5–301(2)(B).

There is no persuasive evidence before the Court that Leaders' interest charges reach 24% per annum. Neither is there evidence that the 6% monthly late charge is anything other than a contractual charge for the debtor's failure to pay in a timely fashion. *See, Wilson v. Dealy,* 222 Tenn. 196, 434 S.W.2d 835 (1968). Assuming that the late charges were considered interest for the extension of credit, there is no persuasive proof that a once a month 6% late charge would approach or exceed the pertinent statutory usury limit and no proof that such a charge for a loan of this amount would be unreasonably high.

The debtor and its partners are sophisticated borrowers, who were represented by counsel in the negotiations over the terms of the notes. The loan commitments (Confirmation Exs. 10 & 11) specifically provided that the loan documents were to be in conformity with Tennessee usury laws. The Court does not interpret the notes as documents intending to charge 6%

---

**6.** Section 506(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

on each late payment twice in a given month, as the debtor would urge this Court to so interpret. There certainly has been no showing that Leader engaged in "unconscionable conduct" as to the interest charges. Tennessee Code Annotated § 47–14–117(c). Further, the debtor's usury attack is undercut by Tennessee Code Annotated § 47–14–115, which provides that one asserting an equitable usury remedy must first pay the lender or tender into court the principal plus lawful interest and loan charges due. The debtor has of course not done that. Reformation may be sought upon the posting of a cost bond, which also has not been accomplished.

Should the Court have confirmed the plan, it would have allowed the monthly late charges from July, 1990, until the first plan payment was paid timely. However, the Court will not confirm this plan, and the monthly late charges may accrue until Leader forecloses or the debtor otherwise negotiates a resumption of monthly payments.

## ARE THE RISKS UNDULY SHIFTED TO THE CREDITOR?

Without unnecessary repetition, it is obvious that the Court has concluded that this negative amortization plan, which requires a deferral of any significant reduction in the principal balance of approximately $12 million in secured debt for seven years, which defers full interest payments for at least three years, which utilizes the secured creditor's collateral in rents to fund the plan, and which offers no new injection of capital by the debtor, unduly shifts the risks of failure to Leader. It is certainly true that the debtor and its partners have previously invested heavily in this project and their investment is at risk. But the plan confirmation requires the Court to look at allocation of new, rather than existing, risk. It is true that Mr. Randolph's guaranty liability would increase as the Leader loans increase, but Mr. Randolph is not the debtor, and Leader's risk will increase each month under the plan until a positive amortization occurs or until Leader is paid from sales or refinancing. The risks to Leader of the plan's failure are too high and are extended too long.

## ARE THE RISKS BORNE BY ONE SECURED CREDITOR?

The proof established that Leader is the servicing lender on these loans and that three lenders have a share of the loans: Leader has 20%; Resolution Trust Corporation, as receiver for Unifirst Bank for Savings, has 20%; and Cumberland Federal Savings Bank has 60%. This factor is favorable to the debtor in that the risks of this plan's failure are spread among three participating lenders. However, this factor does not outweigh the other factors so as to make this negative amortization plan fair and equitable to the participating lenders.

## DOES THE PLAN PRECLUDE THE SECURED CREDITOR'S FORECLOSURE?

During testimony, Mr. Randolph stated that in the event of default under the plan, Leader could exercise its state law foreclosure remedies. However, an examination of the plan does not reveal such a provision, and the Court is left to assume that the debtor's representative correctly stated the debtor's intent. This factor also favors the debtor but does not outweigh the other negative factors considered by the Court.

## DID THE ORIGINAL LOAN TERMS PROVIDE FOR NEGATIVE AMORTIZATION?

The debtor contends that the original loan documents anticipated a negative amortization but this Court disagrees. The original loans contemplated a period of time during the construction phrase when the debt would not be serviced, but funds were reserved in the loans for that purpose. The principal loans were not intended to increase above the maximum loan amount, a result which would be produced by negative amortization. The loans provided for draws which increased the balance with each draw but not above the

stated principal amounts to be loaned. Therefore, this case is distinguished from those cases in which confirmation is made easier when a negative amortization precedent was established in the original loan.

## DOES THE PLAN PROVIDE ADEQUATE SAFEGUARDS TO PROTECT AGAINST PLAN FAILURE?

The Court having found that the plan is not feasible and that the negative amortization plan is not fair and equitable to Leader, it logically follows that the plan can not offer adequate protection against failure. The only protections offered Leader are the debtor's optimism and the equity cushion. The Court is not persuaded that either is sufficiently certain or predictably stable to serve as a foundation for protection. This is true because this is a relatively long-term negative amortization plan in which the debtor continues to forcibly borrow more money from Leader, to use Leader's collateral, including rents, and to place the risks of failure and instability of value on Leader. An equity cushion is more comfortable if the debtor is injecting its own funds or otherwise sharing in the new risks of the plan's new loan and potential failure.

## U.S. TRUSTEE'S OBJECTION

Because the Court is denying confirmation, the objection of the U.S. Trustee to the plan's provision for a continuation of the automatic stay is moot.

## CONTINUED USE OF CASH COLLATERAL AND RELIEF FROM AUTOMATIC STAY

█ Leader has moved for relief from the automatic stay, and the debtor has responded with its position that the equity cushion and the plan provisions adequately protect Leader. As a result of this Court's denial of confirmation, the Court will have no choice but to grant relief from the automatic stay so as to permit Leader to foreclose. The proof has persuaded the Court that there is not a feasible plan "in prospect" of confirmation. *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 108 S.Ct. 626, 632, 98 L.Ed.2d 740 (1988). The debtor's proof is that this plan is the debtor's best effort. However, the Court will give the debtor a final opportunity to negotiate with Leader and as a condition for the stay remaining in effect for fifteen days from the entry of this Order, the debtor will be required to begin to pay Leader any net income after payment of necessary operating expenses. The debtor will no longer be permitted to escrow excess income for tenant improvements. During this fifteen day period, the debtor is authorized to use cash collateral only to the extent necessary for actual operating expenses. If the debtor intends to move for approval of fees and expenses and for their payment out of accrued income or other estate assets, such motions should be filed within ten days from the entry of this order.

Should no further pleadings seeking an extension of the automatic stay be filed within fifteen days from the entry of this Order, the automatic stay will be lifted, without further hearing, so as to permit Leader to foreclose and otherwise pursue its state law remedies. Should the debtor file a pleading seeking to further extend the automatic stay, said pleading shall be set for hearing on an expedited basis.

## CONCLUSION

As a result of the Court's findings and conclusions, and after consideration and balancing of the factors discussed in this opinion, it is the Court's conclusion that this negative amortization plan may not be confirmed.

IT IS THEREFORE ORDERED:

1. That the debtor's cram down confirmation is denied;

2. That the debtor's use of cash collateral is restricted to those funds actually necessary for operation of the Center pending the lifting of the automatic stay or the filing of further pleadings within fifteen days from entry of this order;

3. That the debtor shall have fifteen days from entry of this order to move for a further extension of the automatic stay; otherwise, the automatic stay shall be lift-

ed on October 2, 1991, so as to permit Leader to foreclose and to proceed with other state law remedies as to this debtor and Leader's collateral. In the event the debtor moves within fifteen days from the entry of the order for an extension of the automatic stay, the stay shall remain in effect until an expedited hearing may be held on the debtor's motion;

4. That the debtor should move for approval of any remaining professional fees and expenses within ten days from the entry of this order, if the debtor intends to seek payment of those fees from accrued rental income or other estate assets;

5. That any net rental income not necessary for operation of the Center shall be paid to Leader for application to its claim secured by rents;

6. That the maximum value of the Center is fixed at $16 million, and Leader is an oversecured creditor entitled to its contractual interest, and its reasonable attorney's fees, costs and charges provided for in the contracts and notes between these parties;

7. That the debtor's usury claims are denied; and

8. That the above provisions of this Order are each conditions for the automatic stay remaining in effect for the fifteen day period and pending hearing on any motions for extensions of the stay filed within that fifteen day period.

SO ORDERED.